# EXHIBIT 12

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

HONORABLE NANCY L. DAVIS, JUDGE PRESIDING

DEPARTMENT NO. 306

---oOo---

ROBERT LYMAN, ET AL.,            )
                                 )
            Plaintiffs,          )    CGC-06-459162
                                 )    Jury Trial
   vs.                           )
                                 )    Pages 25 - 90
ASBESTOS DEFENDANTS, ET AL.      )
                                 )    Volume II
            Defendants.          )
_____)

**COPY**

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Thursday, August 9, 2007

Reported by:   Laura Martinez, CSR No. 11332, RPR

```
1   APPEARANCES OF COUNSEL:

2   For Plaintiffs:

3       Brayton Purcell
        222 Rush Landing Road
4       Novato, California  94945-669
        BY:  GARY L. BRAYTON, Attorney at Law
5            JOHN B. GOLDSTEIN, Attorney at Law

6   For Defendant UNION CARBIDE:

7       Brydon Hugo & Parker
        135 Main Street, 20th Floor
8       San Francisco, California 94105
        By:  JOHN R. BRYDON, Attorney at Law
9            BRIAN H. BUDDELL, Attorney at Law

10  For Defendant FREIGHTLINER LLC:

11      Wright Robinson Osthimer & Tatum
        44 Montgomery Street, 18th Floor
12      San Francisco, California  94104-4705
        By:  CHARLES E. OSTHIMER, Attorney at Law

13
    For Defendant MONTELLO, INC.:
14
        Dillingham & Murphy
15      225 Bush Street, Sixth Floor
        San Francisco, California  94104-4207
16      By:  MOLLY MROWKA, Attorney at Law

17

18

19

20

21

22

23

24

25

26

27

28
```

```
 1  August 9, 2007                              10:20 A.M.
 2                    P R O C E E D I N G S
 3       THE CLERK:  All rise, please.  Department 306 is now in
 4  session, the Honorable Nancy L. Davis, Judge presiding.  Please
 5  be seated and come to order.
 6       THE COURT:  Good morning, everyone.
 7       ALL COUNSEL:  Good morning.
 8       THE COURT:  Welcome back, or welcome.  Will you call our
 9  case please, Mr. Chuck.
10       THE CLERK:  Thank you, your Honor.  This case is Robert F.
11  Lyman and Samantha Lyman versus Asbestos Defendants, et al.
12  Case CGC-06-459162.  And, counsel, please state your appearance
13  beginning with the plaintiff.
14       MR. GOLDSTEIN:  Good morning, your Honor.  John Goldstein
15  appearing on behalf of the Plaintiff.
16       MR. BRAYTON:  Good morning.  Gary Brayton on behalf of
17  Plaintiffs.
18       MR. BUDDELL:  Good morning, your Honor.  Brian Buddell on
19  behalf of Defendant Union Carbide.
20       MR. BRYDON:  John Brydon also on behalf of Defendant Union
21  Carbide.
22       MS. MROWKA:  Good morning, Your Honor.  Molly Mrowka on
23  behalf of Montello, Inc.
24       MR. OSTHIMER:  Good morning, Your Honor.  Charles Osthimer
25  on behalf of Freightliner.
26       THE COURT:  All right.  So do we have all the players here?
27  We do not.  I think we're missing one.  Am I correct?
28       MR. GOLDSTEIN:  I believe we're missing two, Your Honor.
```

LAURA MARTINEZ, CSR NO. 11332

1    **THE COURT:**  Whom are we missing at this point?

2    **THE CLERK:**  Your Honor, according to my list we're missing

3    counsel for International Truck & Engine and also Defendant

4    Henry Vogt Machine Company.  Those two counsel were here on

5    August 6th.

6    **MR. GOLDSTEIN:**  As far as I know, your Honor, as of last

7    night there were still five defendants remaining in the action.

8    Now if something has changed this morning, I'm not aware of it.

9    **THE COURT:**  Neither am I, but we're going to go forward in

10   any event.  We are here this morning to talk about the issue of

11   -- well, now I understand what's being proposed is

12   teleconferencing, not just reopening Plaintiff's deposition.

13        And let me say that, Mr. Goldstein, the papers did not get

14   to me until yesterday, and it was my understanding they were to

15   have been filed on Tuesday.  Was I incorrect in my

16   understanding?

17   **MR. GOLDSTEIN:**  No, your Honor.  They were filed by 2:00

18   o'clock on Tuesday afternoon and e-served by 2:00 o'clock on

19   Tuesday afternoon.  I apologize if the courtesy copies arrived

20   yesterday morning to the Court.

21   **THE COURT:**  I believe it was yesterday afternoon that we

22   received what we received, but in any event, courtesy copies are

23   not worth one you know what if I don't have them.  So I expect

24   things to be filed in a timely faction.

25        So I'm going to listen to argument this morning, and since I

26   was only able to deal with this early this morning, and we'll

27   see whether or not I give you -- I don't know whether I'm going

28   to give you my ruling or whether I want to think about what you

1  have to say, because I understand that this is an important

2  motion from your point of view, and I suspect it's also

3  important from Defendants' point of view.  In any event, we'll

4  go forward with argument.

5      I'm also prepared to hear anything further you would like to

6  say, either side, with respect to the motions that you had

7  identified as being most pressing or of greatest concern to you,

8  one being the bifurcation motion that had been filed as well as

9  the preliminary offer of proof for any punitives.  These are

10 both Montello's as I understand it, but you all are joining in

11 each other's, if I understand correctly.

12     I also think we all now know what you were referring to,

13 Mr. Goldstein, when you were making reference to something you

14 wanted to explore, and that's I'm assuming this Motion to Amend.

15 Is that a fair statement or understanding on my part?

16     **MR. GOLDSTEIN:**  Yes, your Honor.

17     **THE COURT:**  Okay.  And I know that defendants have submitted

18 something in response, and I have reviewed that.  So we can look

19 at those motions.  I've not been through all of Union Carbide --

20 I think it was Union Carbide's motions, and then you have

21 submitted your opposition to them this morning; is that correct?

22     **MR. GOLDSTEIN:**  We e-served and e-filed again yesterday by

23 2:00, and I brought courtesy copies along with me this morning.

24     **THE COURT:**  Okay.  Have you all met and conferred on those?

25     **MR. BUDDELL:**  Actually, Mr. Goldstein and I have exchanged

26 e-mails, Your Honor.  I believe with respect to Union Carbide's

27 motions, we will reach agreement on most of them.  I believe

28 there are only a few that bear argument.  Just so I'm clear, my

1   understanding, Your Honor, is we were only going to be arguing

2   the motion with respect to the teleconference satellite link

3   today and the other motions were going to be argued tomorrow,

4   and that's all I prepared for.

5       **THE COURT:**  Okay.  Let's go forward with the motion with

6   respect to teleconferencing, et cetera, so who is pursuing that?

7       **MR. BRAYTON:**  I will be, Your Honor.

8       **THE COURT:**  Go ahead, Mr. Brayton.

9       **MR. BRAYTON:**  Thank you, Your Honor.  As a starting point,

10  the Plaintiff has a right to testify in his own trial, and that

11  would be the Plaintiff's preference, that he appear and that he

12  testify.

13      And the circumstance that there has been a prior trial

14  preservation deposition taken in no way impacts that fundamental

15  right because that was taken to cover the contingency that he

16  may be utterly unavailable by his death or being in such ill

17  health as to be absolutely unavailable to be able to render

18  testimony at the time of trial.

19      So if we start with the proposition that he has the right to

20  do so, and that is the preference, and that is why by the way

21  that our motion that he may be unavailable.  His health is poor.

22  The possibility of having him travel from Nevada to San

23  Francisco to give testimony, it's up in the air whether he's

24  physically capable of doing that at all.

25      It's certainly the case.  It's unquestionable, however, that

26  he could not do so without impacting the quality of the

27  testimony that he would be able to give.  The rigors of travel,

28  the discomfort and fatigue that he would experience in uprooting

1    himself from his bed where he is now, coming down here to give

2    testimony would impact the quality.

3        And it's for that reason that Plaintiffs feel that it's

4    appropriate that the Court exercise its discretion in allowing

5    an alternate means for him to offer testimony, a means which

6    does not violate any right of the Defendants.

7        There are two classes of objections that I make out in the

8    Defendants' opposition.  One is that there would be prejudice.

9    "Allowing him to testify remotely would likely generate sympathy

10   among the members of the jury."

11       Well, it certainly wouldn't engender any greater sympathy

12   than his actual physical presence in the courtroom, and in fact,

13   I would suggest that if you want to characterize his difficult

14   medical circumstances as somehow being prejudicial.  To have him

15   physically present, it would be more prejudicial.  It would be

16   inclined to induce more sympathy.

17       You can at least with a video kind of have a tight shot of

18   just the Plaintiff himself and not all the paraphernalia and

19   medical apparatus that is necessary to sustain him, the oxygen

20   machine, the feeding tube, the things that are necessary to keep

21   Mr. Lyman going at this point.

22       So I think the notion that there's some something inherently

23   prejudicial about the prospect of having him testify via a live

24   video feed simply doesn't hold up as compared to the alternative

25   of him being present in the courtroom which he would have every

26   right to do were he able to do so and were he able to give the

27   same quality of testimony by appearing in person.

28       The second level of objection is that it somehow impairs the

1  right to cross-examination.  I would reiterate what

2  unfortunately Your Honor hasn't had time to possibly fully

3  consider in our moving papers that unlike in the criminal sphere

4  where there is an absolute right to physical confrontation, the

5  confrontation, if you want to call it that, the right to

6  confront and cross-exam in the civil context is limited and does

7  not include the right to physical confrontation.

8      In fact, Defendants in their suggested alternative that we

9  simply fall back on the video trial preservation deposition

10  makes it clear that there is no such absolute right.  He's not

11  physically present to the jurors.  They would have exactly the

12  same opportunity to judge his demeanor in viewing a videotape of

13  his testimony as they would have in the circumstances that we

14  propose, a live video feed, but with the advantage of it's live

15  and direct.  It's happening now before their eyes and ears.

16      It's the case that we cited in our brief, the *Mary S* case,

17  that was a juvenile dependency action, a case which I submit

18  involves somewhat more substantial rights than the pocketbook

19  rights that are at stake here, and it involves the parental

20  rights as it goes to the children.

21      In that case, the court, out of consideration of the quality

22  of the testimony and the ability of the witnesses to testify

23  made provision for them to give testimony in chambers.  It was

24  of course a bench proceeding in chambers outside the presence of

25  the parties.

26      It was not the case that the witness or at least one of the

27  child witnesses was absolutely unable to testify, but rather

28  that her level of distress and discomfort in giving testimony in

1   the presence of the parties would be such as to impact the

2   quality of the testimony she should give.

3        If a court can pay heed to the emotional circumstances of a

4   witness as it weighs into the balancing of whether to make an

5   accommodation or not and whether to limit -- and there was a far

6   greater limiting I would note in re *Mary S* where there was no

7   contact, took place entirely outside the presence than what

8   we're proposing here with a video where the parties as well as

9   counsel will have the opportunity to observe the witness.

10       So if the Court can make that kind of accommodation and make

11  that narrowly limited restriction on the right to confront and

12  cross-examine, as it did in *Mary S*, this Court can certainly

13  make a similar accommodation for the physical well-being of

14  Mr. Lyman and his capacity to give the best testimony he is able

15  to give at this point in his life.

16       And what's lost is minimal.  He's not there.  They don't see

17  him in the flesh, but the jury will see everything that's

18  significant, the Plaintiffs admit, to the credibility

19  determinations they need to make.

20       The final set of points that the Defendants raised in

21  opposition is that the remote arrangement would essentially

22  allow for some shenanigans that there could be off-camera

23  coaching.

24       And they make another point that there would be some

25  inconvenience with respect to trying to present the witness with

26  an exhibit, a deposition transcript, discovery responses or some

27  other exhibit.  I don't know what all they might have in mind

28  precisely, but that there would be some difficulty with that.

1    With respect to all of those mechanical objections, if you

2  will, Plaintiffs are prepared to submit to any set of ground

3  rules that the Court would want to set up to ensure against any

4  high jinks on the part of the Plaintiffs, any inappropriate

5  conduct that they would seem to think would be undertaken and to

6  accommodate having someone present to facilitate showing --

7    We could have, for example, every transcript, every bit of

8  discovery, any exhibits, and in fact give, if counsel wants to

9  ensure the ability that they're not tipping their hand, they

10  could have them available under seal or something to be opened

11  only at the point that they wanted to engage in the examination

12  of Mr. Lyman.

13    As example, a party, either a representative of Defendant or

14  a neutral party at our expense, however we want to arrange it,

15  someone there to facilitate the mechanics of showing the witness

16  exhibits.  It's not impractical to do.

17    It serves the most, the interest of justice which is the

18  ultimate manner in which the Evidence Code is to be interpreted,

19  and it's an appropriate exercise to this Court's discretion to

20  allow Mr. Lyman his opportunity to give the best testimony he

21  can.  Thank you.

22    **THE COURT:**  Thank you.  Any other case law besides *Mary S*

23  which I have read that you would like to offer?

24    **MR. BRAYTON:**  No, Your Honor.  I would note this is not

25  without precedent.  As recently as last year in a case of ours a

26  witness testified in Judge Mellon's courtroom via live video

27  feed on account of health considerations.  That was a Brayton

28  case.

1    THE COURT: All right. Counsel for the defense, would you
2  like to respond?

3    MR. BUDDELL: Thank you, Your Honor. First of all, before
4  we even get to the substance of this motion, Your Honor, let's
5  talk about procedure. Mr. Brayton has talked about how
6  Mr. Lyman's health is at issue, that he's got these feeding
7  tubes. There's all this, yet there's not one shred of
8  admissible evidence in their moving papers to support this.

9    At a minimum, to carry any consideration to this motion,
10  they should have had a declaration from a doctor. How about a
11  declaration from Mr. Lyman himself saying, "I'm really feeling
12  sick. I don't think I could make it." They don't even have
13  that. All we've got are the hearsay representations in these
14  papers and that which is said in court today. That is not
15  admissible.

16    The Court cannot rely on that. They have the burden of
17  carrying their burden of proof here to show why the Court should
18  even consider this extreme remedy. They haven't done that, so
19  they don't even get out of the gate.

20    Secondly, with respect to the procedural issues, the motion
21  is -- well, actually, there is one other procedural issue before
22  we get to the substantive. Their motion also in addition to the
23  proposition of having the satellite feed is that there be
24  another videotaped deposition offered to conduct a redirect and
25  correct the inadequacies I believe they called them or mistakes
26  in testimony.

27    That issue has already been litigated. That's a discovery
28  matter. It was brought before Commissioner Chan, and

1  Commissioner Chan said, "No way. You don't have good cause.

2  I'm not letting it happen." So to the extent that that second

3  part of this motion is requesting that in this court, that's

4  tantamount to a motion for reconsideration that is both untimely

5  and improperly before Your Honor.

6      If they had an issue with Commissioner Chan's ruling, they

7  needed to bring it back before him and try again the Code

8  provides for that. Another judge can't hear a motion for

9  reconsideration. They're trying to get a second bite at an

10  apple that they already lost.

11      **THE COURT:** Could you provide me, and that's one of the

12  questions I had and saw the reference to that set of

13  proceedings. I must say I found the papers somewhat difficult

14  to work through in the Plaintiff's papers in making reference to

15  various exhibits, and I think there are exhibits that are

16  attached to exhibits, so there were two Exhibit B's.

17      And so I would like to have a sense of that time line of

18  when that was heard. I saw that there was a declaration among

19  other things by Ms. Noah or Mr. Noah for a proceeding in

20  Department 633 on July 16, 2007. Is that the one you're

21  referring to, Mr. Buddell?

22      **MR. BUDDELL:** That's correct, Your Honor. They went in

23  ex parte on 7/16/07, and the reason that there's not a written

24  order denying it is because it was ex parte proceeding, and

25  typically the Court won't issue an order denying an ex parte.

26  They just simply deny them as opposed to a formal motion.

27      But that said, Commissioner Chan expressly stated that there

28  simply was no good cause to allow another deposition of

1  Plaintiff given the fact that he has already been deposed and

2  that Plaintiffs have already videotaped his testimony for

3  purposes of playing it at trial if necessary.

4      **THE COURT:**  So there was a ruling -- the ruling from the

5  Commissioner was not just with respect to the order shortening

6  time.  There was a ruling on the merits.

7      **MR. BUDDELL:**  That's correct, Your Honor.

8      **THE COURT:**  Okay.  Go ahead.

9      **MR. BUDDELL:**  Now turning to the substantive issue, I'll

10 first talk about this right to confront the witness.  It's

11 certainly a novel argument that Mr. Brayton makes that a

12 defendant is not entitled to counteract or confront his witness

13 face-to-face, but there's no case law to support that.

14     As much as he can try to distinguish the one case that was

15 cited before the Court today, there's not a single case that

16 carries his point.  So even if we do throw that one case out, we

17 are still left with nothing except the Constitution which says,

18 "You are right.  You are entitled as a defendant to confront

19 witnesses who offer against you."

20     From a pragmatic standpoint, we can argue all day as to

21 whether the jury would get a good picture, but as any lawyer who

22 has ever tried a case before can say, a witness's demeanor on

23 the witness stand versus sitting in the comfort of their own

24 home is going to be markedly different, especially in this case

25 where we're going to have a witness who unequivocally denied

26 being exposed to Montello products, and he is now going to come

27 in and testify, presumably, that he was exposed, and that "my

28 sworn testimony under oath, well, don't believe that."

1    Clearly having to do that staring at 12 people in a box is
2    going to be a much different situation than sitting looking into
3    a camera sitting on his couch or his recliner or wheelchair or
4    whatever it may be in his house.

5    I submit that there absolutely is a right.  There is no case
6    law that controverts that.  They have cited nothing, so from a
7    substantive standpoint, there is no question of that.  As for
8    Mr. Lyman's right to testify in person, I'm not aware of such a
9    right.  I don't see that in the Constitution anywhere.

10    Certainly he's entitled to, but there are plenty of cases
11    where plaintiffs for one reason or another don't testify.  The
12    perfect example is a wrongful death case where the spouse is the
13    plaintiff, or the heirs perhaps.  They don't know a thing about
14    the decedent's work history.  They don't choose to testify
15    because in fact they don't do anything or know anything, and the
16    plaintiffs prove their entire case through the co-workers or
17    expert witnesses or whomever they choose to call.

18    There is no right to testify in person.  But that said,
19    there is nothing that is preventing Mr. Lyman from doing so.
20    Again, it goes back to the issue of proof.  They have not proven
21    that Mr. Lyman can't make it.  Mr. Lyman hasn't said he can't
22    make it.  Even their papers don't say he can't.  They say he may
23    not be able to make it and that it could inconvenience him to do
24    it.  That's not good enough.

25    I find it a little disturbing in the fact that there was
26    actually some discussion from one of the Brayton attorneys to
27    our office who told us straight away that Mr. Purcell was
28    actually hoping the motion gets defeated so Mr. Lyman does come

1    and testify and he can tell the jury how we hauled him out here

2    instead of letting him testify via satellite.  That didn't sound

3    like a man who was too ill to attend.  And I think it speaks

4    volumes that they couldn't get a doctor's declaration or a

5    declaration from him to prove their case.

6        Another thing that I think is important to consider is that

7    to the extent there is inconvenience or a problem getting him

8    out here, that is self-created.  First of all, Mr. Lyman was

9    diagnosed with lung cancer in October of 2006.  They chose to

10   file their complaint December 29th here in San Francisco despite

11   the fact that Mr. Lyman lives in Nevada.

12       I don't think there was any indication that Mr. Lyman was

13   going to get better or that his condition was going to improve

14   over the six months or nine months or year or whatever it would

15   take to set a trial.

16       So if they were truly concerned with Mr. Lyman's ability or

17   inconvenience to testify, they should have filed in Nevada close

18   to Mr. Lyman's home, and we could have handled it that way.

19   Instead, they chose to file it here in the plaintiff-friendly

20   jurisdiction of San Francisco, and they do so at their own

21   peril, so they've created their own problem here.

22       They've then added another level of problems when they

23   properly noticed the videotaped deposition of Mr. Lyman in order

24   to preserve the testimony to play for the jury, they didn't ask

25   the right questions.  At that time, every defendant that is

26   currently in this case was in the case.  They had full

27   knowledge, as at least his attorneys did, as to what products

28   were at issues and what allegations were going to be made.  They

1    didn't ask the right questions on their direct examination.

2        The Defense's discovery deposition went forward.  Further

3    damaging testimony was given by Mr. Lyman.  They could have

4    reopened their videotaped direct at that point and asked further

5    questions.  They chose not to, and here we stand.  Now they're

6    essentially asking for the procedural equivalent of a Mulligan

7    at the Defendants' expense, and that's just not right.

8        Now from a pure logistics standpoint, there is a huge

9    inconvenience here.  As I've already stated, there's a big

10   difference from testifying in a witness stand in a court of law

11   versus at home, and also from a jury's standpoint being able to

12   look at Mr. Lyman as he tries to recreate his testimony and

13   reinvent his testimony and the body language and all that goes

14   into evaluating the credibility of a witness versus seeing a

15   talking head in a little box from the neck up.  That doesn't do

16   it.

17       With respect to the document issues, that's a huge problem.

18   As I've indicated, Mr. Lyman has changed his testimony.  In fact

19   he's changed it three or four different times in varying ways.

20   From that perspective, it's hard to say what we're going to need

21   to impeach Mr. Lyman.

22       So even if we could foresee and come up with a reasonable

23   idea as to what would need to be taken to Mr. Lyman to hand to

24   him as an exhibit for impeachment, who knows whether he's going

25   to say something else different that's going to require

26   something else that's here in the courtroom or back in our

27   office or who knows what?

28       The logistics are just impossible to deal with, not to

1  mention we might likely not be dealing with just documents that

2  can be photocopied or faxed or sent over a little Elmo type

3  arrangement.  There could be a tangible piece of evidence that

4  Mr. Lyman might need to see that's not going to have the same

5  effect if it's held up to a camera.  By rule, Mr. Chuck is going

6  to have to take possession of them as evidence in the case.

7  Logistically it doesn't work.

8      As for the shenanigans Mr. Brayton referenced, I'm not

9  suggesting that they're going to be coaching him or have cue

10 cards or something there.  Certainly we would insist on at a

11 minimum having somebody there, but clearly the dynamics are

12 different and that has to be taken into consideration here.

13     I think, Your Honor, that pretty well covers the main

14 points.  There is the issue of costs which I'll defer argument

15 to, depending on how the Court may be leaning on this.

16     But from the procedural and substantive standpoints, to sum

17 up, procedurally they haven't carried their burden.  They

18 haven't submitted any admissible evidence for this Court to rule

19 on or consider.  They haven't submitted any case law to support

20 their position, and the fairness and equity of allowing this to

21 go forward simply isn't there.  Thank you, Your Honor.

22     **THE COURT:**  Do you want to join in?

23     **MS. MROWKA:**  Yes, actually, I do.

24     **THE COURT:**  Perhaps you could add a chair at the table.

25 Thank you, gentlemen.  Go ahead.

26     **MS. MROWKA:**  I just wanted to indicate Montello's joinder in

27 the comments and arguments made by counsel for Union Carbide,

28 and I just want to make one point of clarification, and that is

1  that it's not so much that they didn't ask the right questions.

2  It's that they didn't get the answers that they realize that

3  they need now.

4      **THE COURT:**  All right.  What about you, sir?  Would you like

5  to join in this fray?

6      **MR. OSTHIMER:**  Your Honor, on behalf of Freightliner, we

7  join in the opposition.  I have no other comments to make.

8      **THE COURT:**  All right.  Mr. Brayton, would you like to say

9  anything in response to Mr. Buddell?

10     **MR. BRAYTON:**  I'll try to be brief, Your Honor.  I won't get

11 into a "he said, he said" back and forth with counsel here

12 except to point out that indeed in their moving papers they did

13 suggest that there would be off-camera coaching going on on the

14 part of plaintiffs, notwithstanding that Mr. Buddell today

15 saying that he's not suggesting that we do anything of the sort.

16     In any event, just substantively to a couple points.  With

17 respect to the lack of a declaration, there is in fact a

18 declaration of a doctor from March which describes Mr. Lyman's

19 very precarious health at that point which included the fact

20 he's on 24-hour oxygen being fed through a tube in his stomach

21 and so forth.  He's not getting any better.

22     But the absence of a current declaration has to do with the

23 fact that his health is fluid.  As I said at the very outset, it

24 is our hope -- and I do take exception to Counsel's comment

25 about what some unnamed lawyer said about what Mr. Purcell said

26 about what Mr. Lyman said, if I understood what was represented.

27     But it's clearly Plaintiff's preference to attend and give

28 testimony in the courtroom if that's possible.  The is in some

LAURA MARTINEZ, CSR NO. 11332

1   sense a shot across the bow alerting the court and parties to

2   the likelihood that he may not be able to do so, or that doing

3   so will adversely impact the quality of his testimony such as to

4   make the accommodation that we request appropriate.

5       We can certainly augment what we have presented the Court

6   today at the point that push comes to shove we have to make an

7   ultimate decision.  Can we load him up in a Medi-van or whatever

8   it takes to get him here and get him down to the courtroom or

9   not.  We can and will make the showing as to his particular

10  circumstances at that point, his medical circumstances and the

11  impact that it would have.

12      I think for purposes of bringing the Court's attention to

13  this issue and having the Court give consideration as to whether

14  or not an exercise of discretion is appropriate, the information

15  before the Court is sufficient for the Court to clearly infer

16  that Mr. Lyman is in very precarious health and that it would

17  have adverse impacts on his ability to testimony to make the

18  extensive trip.  Other than that, it's submitted.

19      **THE COURT:**  Would you like to say anything further,

20  Mr. Buddell?

21      **MR. BUDDELL:**  Very briefly, Your Honor.  I think what we've

22  got here is Mr. Brayton has just conceded my point.  They didn't

23  file what they needed to.  He says they could if necessary.

24  Well, it is necessary.  This is a motion.  This is a court of

25  law.  You have to have submit evidence; they haven't done that.

26      He's also suggested that Mr. Lyman's health is fluid right

27  now and that this may be something that comes up later.  If

28  that's the case, what are we doing it now for?  There's simply

1  no reason.

2      And as for the doctor's declaration, it is not attached to

3  these papers.  I challenge Counsel to look through and show me a

4  doctor's declaration and show me the papers they submitted.  It

5  is not there.  As to the unnamed lawyer, I did that as a

6  courtesy to him.  I'd be happy to name the Brayton lawyer, but I

7  won't, unless the Court wants me to.

8      **THE COURT:**  I don't think I want to inquire.  I believe the

9  declaration that was referred to is one that had been previously

10  on file, and you may be correct that it's not in these papers.

11  Is that your point, it's not in these papers, though there may

12  have very well be been one on another occasion?

13      **MR. BUDDELL:**  Right, and that was the declaration submitted

14  in support of the motion for preference which simply stated that

15  there was a likelihood that Mr. Lyman wouldn't survive long

16  enough to have an extended trial date under regular

17  circumstances.  And we don't dispute that.  I don't think we

18  even opposed the motion for preference.

19      But that's not what's at issue here.  What's at issue here

20  is not whether he'll be able to make it for trial or not.  It's

21  whether he's going to be able to physically make it to trial or

22  not.

23      And one other issue that I didn't raise, and I had alerted

24  the Court to this before, is that to the extent this does go

25  forward and Mr. Lyman is able to offer this change in testimony,

26  there's the very real possibility that we will be calling a

27  Brayton attorney as a witness to discuss this refreshed

28  recollection.  We've named that attorney in our witness list,

1  and certainly that possibility exists even if Mr. Lyman would

2  testify here in person, but obviously if he is not in such a

3  manner that he's able to do that and the Court denies the relief

4  they're requesting now, that would not be necessary.

5      And, lastly, I'll simply re-emphasize my point that there is

6  no need for this.  The appropriate remedy was taken by

7  Plaintiff's counsel by videotaping the deposition.  That's in

8  the can.  It's ready to go if Mr. Lyman can't make it here for

9  whatever reason, and they would suffer no prejudice, at least

10 under California case law or statutory law, that would warrant

11 any other need for other forum.

12     **THE COURT:**  Let me inquire when the matter went before the

13 Commissioner for reopening the video deposition, that's my

14 understanding of what occurred in sometime in mid-July I gather,

15 what kind of medical support did you have at that time did you

16 offer to the commission, if any?

17     **MR. GOLDSTEIN:**  If I might, Your Honor.  I was present at

18 that hearing, in that ex parte.  At that time we did provide a

19 copy of the doctor's declaration as part of the ex parte papers

20 that both Mr. Brayton and Mr. Buddell have been referring to.

21     **THE COURT:**  So it was the earlier declaration from March or

22 April?

23     **MR. GOLDSTEIN:**  It was the declaration that stated that, and

24 I believe, I'm just paraphrasing the declaration that in this

25 doctor's view, Mr. Lyman had less than six months to live.

26     **THE COURT:**  Okay.  So it was in the -- just to be clear on

27 the record, it was the declaration in support of the motion for

28 preference; is that correct?

1    **MR. GOLDSTEIN:** It was, Your Honor, and I might add that the

2  ex parte hearing was not transcribed, and there's a continuing

3  argument between parties over exactly how and for what reasons

4  Commissioner Chan decided to deny the ex parte application.

5      And from Plaintiff's perspective, Commissioner Chan was

6  considering the fact that we were less than a week and a half

7  away from the actual trial date when he made that decision.  He

8  asked specifically, "What is your trial date?"  And he was

9  anticipating the time it would take to arrange a deposition and

10  how quickly the trial date was approaching.  And I think it had

11  quite a bit to do with that.

12      I know counsel was saying that there was no good cause

13  showing, but I don't believe that it was solely that on the part

14  of Commissioner Chan, but there's no way of demonstrating that

15  either through an order or a transcript.

16    **THE COURT:** Anyone else want to add to that?  Yes, ma'am.

17    **MS. MROWKA:** Yes, Your Honor.  I was present at that hearing

18  as well, and that particular motion was vehemently objected to.

19  And the whole chronology was gone into in terms of their prior

20  deposition of the Plaintiff, the videotaped deposition they

21  took, and then all of the follow-up which went for I believe six

22  days of Defense discover.  And the whole purpose --

23    **THE COURT:** I think that mike may not be on.  Go ahead.

24    **MS. MROWKA:** In any event, the whole chronology of the fact

25  that the Plaintiff's deposition had already been taken by

26  videotape and that the Defendant had cross-examined the

27  Plaintiff, done the follow-up for many days following that, and

28  that the purpose that they were trying to redepose the Plaintiff

1  was based on his purported declaration in terms of his purported

2  recalled recollection.  And she tried to basically ask the same

3  questions and get different answers in terms of product

4  identification.

5      So the whole basically the history of the depositions and

6  the testimony and the reasons they were trying to redepose the

7  Plaintiff again was all gone into in terms of the Commissioner,

8  and he said, I don't recall his exact words, but it was

9  basically based upon everything that had been submitted and his

10  understanding of what had been presented to him during the

11  hearing that he found there was no good cause.

12      **THE COURT:**  Anybody wish to respond to that?  Mr. Goldstein?

13      **MR. GOLDSTEIN:**  No, Your Honor.

14      **THE COURT:**  Mr. Brayton?

15      **MR. BRAYTON:**  No, Your Honor.

16      **THE COURT:**  Anything from anybody else?

17      **MR. BUDDELL:**  Submitted, Your Honor.

18      **THE COURT:**  All right.  I want to think about what I've

19  heard this morning, and I want to make good use of our time.  I

20  think that one of Union Carbide's attorneys had been inquiring

21  about travel for your colleague from Texas, as I recall; is that

22  right?

23      **MR. BUDDELL:**  Yes, Your Honor.

24      **THE COURT:**  I think it's fair to say that we will not be

25  selecting a jury tomorrow, so you can have him or her look for

26  plane tickets for Monday, if that's helpful to you.

27      **MR. BUDDELL:**  Actually, Your Honor, I think he will be here

28  tomorrow, but that's still good to know.

1    **THE COURT:** For other reasons perhaps he will be here

2    tomorrow. I know that we have I believe a questionnaire from

3    each side that's been submitted; is that correct?

4    **MR. GOLDSTEIN:** Yes, Your Honor.

5    **MR. BUDDELL:** Yes, your Honor. And my understanding,

6    Mr. Goldstein and I have exchanged some e-mails, and I actually

7    am going to be stepping aside because I'm going to be getting

8    married on Saturday.

9    **THE COURT:** You think that's good cause not to be present

10   for these proceedings?

11   **MR. BUDDELL:** I was supposed to be off today. You can ask

12   him. But the latest exchange is Mr. Jordan, who is the lawyer

13   from Texas, is going to be speaking with Mr. Purcell and

14   hopefully they'll get to work something out with respect to that

15   questionnaire.

16   The last I saw, and I haven't checked my e-mail obviously in

17   the past hour or so, was that there was some talk of that maybe

18   occurring tonight. I know we were supposed to be back here

19   tomorrow arguing the other motions. Perhaps there will be some

20   light to be shed at that time. I would expect there would be,

21   if nothing else, a narrowing of disputes, if not a full

22   agreement.

23   **THE COURT:** If we're going to be start selecting a jury on

24   Monday, we need to conclude the questionnaire issues tomorrow,

25   because Plaintiff will need to at least in my experience it's

26   been Plaintiff who has carried the water on getting

27   questionnaires produced and copied and all of that.

28   **MR. GOLDSTEIN:** We'd be happy to do that.

1   **THE COURT:** There you are.

2   **MR. BUDDELL:** If experience holds, Your Honor, with respect

3   to trials with Mr. Purcell before, we've been able to reach

4   agreement. I think the last one we fully agreed on the juror

5   questionnaire.

6   **THE COURT:** Good. I think the only thing left is the

7   court's agreement.

8   **MR. BUDDELL:** There you go. Like I said, I'm kind of

9   speaking for somebody else here. I'll go a little far out on

10  that limb, but I think at a minimum by tomorrow there will be if

11  not a complete agreed questionnaire, one that is substantially

12  agreed upon and a handful of questions that the Court may need

13  to get involved in and then a finalization.

14  **THE COURT:** What I'd like to do is talk about, and I'm not

15  going to ask you to argue now, but talk about make absolutely

16  clear what motions everybody needs to have dealt with before any

17  openings or dealing with a panel of jurors. Okay. So we can go

18  through that and make sure that our T's are crossed. I think I

19  have a fairly good idea, but sometimes things change. I'm very

20  aware of that as well.

21      Yes, Mr. Buddell?

22  **MR. BUDDELL:** In that regard, Your Honor, I think that again

23  Mr. Goldstein and I exchanged an e-mail yesterday that I think

24  we are pretty well on board in terms of what we're agreeing to

25  save for just a few. And I don't know that any of those that

26  remain really need to be discussed before opening.

27      There is one issue though and this also came up yesterday in

28  an e-mail exchange in that when we were here the other day,

1   Mr. Goldstein had represented to the Court that based upon Judge

2   Mahoney's ruling in the summary adjudication and summary

3   judgment hearing, that they would only be seeking punitive

4   damages against Montello.  That's what I heard.  And that's

5   consistent with the Court's ruling.

6       Yesterday Mr. Goldstein informed me that that was not his

7   intention and that he was reading Judge Mahoney's ruling to

8   possibly state that punitive damages had not been thrown out

9   against Union Carbide which is absolutely incorrect.  They were

10  thrown out in their entirety.

11      There is no written order to that effect.  Because they

12  prevailed on the Motion for Summary Judgment, Judge Mahoney

13  ordered them to prepare the order, and they haven't done that.

14  But the transcript is clear, and I have got a copy of the

15  transcript, and the tentative ruling which was adopted by the

16  Court was also clear that punitives in their entirety against

17  Union Carbide has been thrown out.

18      **THE COURT:**  Well, you did anticipate one of my other

19  questions which is when I looked at the statement from

20  Plaintiffs about causes of action, that Plaintiffs had indicated

21  that they will seek findings of malice as a predicate for

22  pursuit of punitive damages.  And my query was against whom?

23  What about Union Carbide's motion with respect to summary

24  adjudication?  So how about somebody responding to that.

25      **MR. GOLDSTEIN:**  Your Honor, Plaintiffs only hesitate on this

26  issue because there is at this point a lack of clear

27  understanding as to whether or not the finding on the issue of

28  punitive damage was merely applicable to the fraud and

LAURA MARTINEZ, CSR NO. 11332

1  misrepresentation or if somehow it applied to the cause of

2  action which was denied summary adjudication, negligence.

3      On that same set of facts, Plaintiff is -- at the very least

4  we're concerned that Judge Mahoney did not intend the punitive

5  damage to be excluded from the negligence because, from our

6  perspective, that would have been the Judge weighing the facts

7  and not ruling on the law, and we can't imagine that that's what

8  occurred.  I don't have the benefit of the transcript, and as

9  Mr. Buddell said, there's no order yet signed by Judge Mahoney.

10     **THE COURT:**  Mr. Buddell seems to have a transcript

11  available.  Is there something that we can have you address, or

12  do you need to submit that both to counsel and to me so we can

13  peruse it, Mr. Buddell?

14     **MR. BUDDELL:**  However Your Honor would like to do it.  But,

15  Your Honor, I argued that motion, and Mr. Chu from their office

16  as well.  And Ms. Mrowka was there as well in the gallery.  But

17  that issue was directly brought up.  In fact, Mr. Chu asked

18  Judge Mahoney with respect to the punitives is that -- his

19  question was:

20         "Question:  With regard to your tentative for

21         punitive damages, is that with regards to all

22         punitive damages or punitive damages with regard

23         to false representation only?  I'm just -- I am

24         confused, Your Honor, and I need a little

25         clarification with regards to possible punitive

26         damages with regards to our claims for

27         negligence."

28     The Court responded, "You can't have punitive damages for

```
 1  negligence."
 2       THE COURT:  Would you care to respond?  Mr. Goldstein.
 3       MR. GOLDSTEIN:  Your Honor, obviously the transcript says
 4  what the transcript says.  Again, it seems to Plaintiffs that if
 5  we are permitted to proceed on our cause of action for
 6  negligence and if we present evidence which demonstrates
 7  despicable conduct, oppressive conduct on the part of Union
 8  Carbide, I don't see how it is that Plaintiff at that point
 9  can't address that with the Court and renew that request for
10  punitive damages.
11       I'm afraid that from our perspective again, it was an
12  inappropriate weighing of the facts.  If there was sufficient
13  facts to establish negligence, the triable fact with regard to
14  negligence, is it not a question of the trier of fact
15  considering whether or not the facts support the conduct of
16  oppressive and harassing, despicable conduct on the part of the
17  defendant?
18       I'm simply stating that I think this is a matter of whether
19  or not Plaintiff presents the necessary evidence to go forward
20  with that at trial.
21       THE COURT:  Notwithstanding Judge Mahoney's ruling.
22       MR. GOLDSTEIN:  Notwithstanding Judge Mahoney's ruling.
23  That is correct, Your Honor.  That's what I'm saying.
24       THE COURT:  Mr. Buddell?
25       MR. BUDDELL:  Your Honor, what it sounds like is
26  Mr. Goldstein is arguing that Judge Mahoney got it wrong, and
27  I'm not prepared --
28       THE COURT:  That's exactly what it sounds like.
```

1    MR. BUDDELL:  Right, and whether he's correct or whether
2  he's incorrect, this is not the proper forum in which to decide
3  that.  The order was granted and issued by Judge Mahoney.  If
4  they have an issue with that and think that he got it wrong,
5  there's a building across the street that they can deal with
6  that.
7    We're in trial.  It's improper for them now to try to raise
8  that again with Your Honor to second-guess Judge Mahoney.  As
9  Mr. Goldstein says, the transcript says what the transcript
10  says, and the transcript says punies are out as to Union
11  Carbide.
12    THE COURT:  Anything further on this point?
13    MR. GOLDSTEIN:  No, Your Honor.
14    THE COURT:  Okay.  Thank you.  Let's talk about our
15  scheduling including when I'm going to tell you my views about
16  what I've heard this morning.  Mr. Buddell, since you are not
17  going to be in the mix it appears, and you have outside counsel
18  coming in; is that correct?
19    MR. BUDDELL:  That is correct, Your Honor.
20    THE COURT:  Who is carrying the mantel at this point for you
21  all with respect to the questionnaire?
22    MR. BUDDELL:  I guess I don't understand your question.
23    THE COURT:  In terms of nailing down what the
24  questionnaire -- I would like to see the questionnaire.  I would
25  like you to meet and confer, deal with the questionnaire and get
26  that to me this afternoon so if I've got any issues with that we
27  can address it tomorrow, and then Mr. Goldstein can make his way
28  to the copy shop.

1    **MR. BUDDELL:**  Well, we had proposed -- I had actually

2  proposed meeting with Mr. Purcell as early as two days ago.  He

3  told me he couldn't make it.  He then said how about last night

4  late, and I couldn't make that.  He is again proposing early

5  evening or late afternoon today.

6    **THE COURT:**  I want it this afternoon.  Here are your

7  choices.  You can meet and confer and try to come up with

8  something that you agree on, and if you do agree on it, I would

9  say the odds are very good that I will agree on it.

10    And if you don't meet and confer and get it to me this

11  afternoon, I will give you a questionnaire, and that's the

12  questionnaire you will use.  So if you want to have a say in it,

13  get it to me by 3:00 o'clock this afternoon.

14    **MR. BUDDELL:**  What I think we'll do, Your Honor, is in an

15  abundance of caution -- I thought we already submitted our jury

16  questionnaire to the Court.

17    **THE COURT:**  You have one submitted, and I believe that

18  Plaintiff does.  My point is have you met and conferred and

19  agreed upon it?  If you want to all submit it to me and I'll

20  tell you what it's going to be, that's fine.  You can do that

21  right now if you want.

22    But if you want the opportunity to work it out between

23  yourselves, I'm giving you that opportunity, and if other people

24  are just too busy to deal with it, I'll deal with it.  So what

25  do you want to do?  Are you going to have something to me by

26  3:00 o'clock this afternoon?

27    **MR. BUDDELL:**  Again, Your Honor, we were willing to meet.

28  It was Mr. Purcell who was unavailable.

1    **MR. BRAYTON:**  We'll make an effort to see if we can meet and

2    confer by 3:00 o'clock this afternoon.

3    **THE COURT:**  All right.  I want a hard copy, courtesy copy

4    with Mr. Chuck by 3:00 p.m.

5    **MR. GOLDSTEIN:**  May we fax it to your attention or to the

6    Court, your Honor?

7    **THE COURT:**  As long as it's here in a timely fashion.  I

8    know you all have a lot of cases.  You're running around from

9    courtroom to courtroom.  This matter is here for trial, and it's

10   moving.

11   **MR. GOLDSTEIN:**  I only requested that because our office

12   happens to be in Marin County, and it's much easier for us to

13   e-file or fax serve, Your Honor.

14   **THE COURT:**  Okay.  That's part of the reason why e-filing

15   was put in place.  I don't quarrel with that.

16       The motions that I understand that we need to have rulings

17   on are the Plaintiff's Motion to Amend Complaint to Conform to

18   Proof, the in limine with respect to witnesses regarding

19   proximate cause, and Plaintiff's second one, ambient exposure.

20   Those are the ones other than the one we heard this morning that

21   are on Plaintiff's side of the ledger.  Is that right, nothing

22   else?

23   **MR. BRAYTON:**  Correct.

24   **THE COURT:**  Okay.  And then with respect to Defendants, we

25   have Montello's motion requesting a Preliminary Offer of Proof

26   for Punitive Damages.  And the second one...

27   **MS. MROWKA:**  Bifurcating, Your Honor.

28   **THE COURT:**  Was the bifurcation, that's right.  Those were

1 | the ones that needed to be addressed ASAP.  Is there anything

2 | else from Defendant's standpoint that I'm missing or not

3 | addressing at this point?

4 |     **MR. BUDDELL:**  Not that's on file, Your Honor.  The only

5 | qualification that I'll make on that is obviously if the Court

6 | would grant Plaintiff's motion to add a cause of action for

7 | battery, there will be a whole bunch more motions in limine

8 | including a request to continue the trial date.

9 |     But with what Mr. Goldstein and I have talked about, I don't

10 | think there's anything that the Court needs to hear right away.

11 | We can defer them as the evidence starts coming in.

12 |     **THE COURT:**  All right.  Now I would be willing to provide

13 | some time this afternoon to hear argument on these if you were

14 | prepared to do so.

15 |     **MR. BUDDELL:**  With respect to that one, Your Honor, I don't

16 | have it with me, but it wasn't very long and I'm ready to argue

17 | that.

18 |     **THE COURT:**  Do you want to argue it now?

19 |     **MR. BUDDELL:**  That one.

20 |     **THE COURT:**  The Motion to Amend?

21 |     **MR. BUDDELL:**  Yes.

22 |     **THE COURT:**  All right.  We can do that.

23 |     **MR. BUDDELL:**  I have no problem with that, and I think it

24 | certainly is of import to get that along.

25 |     **THE COURT:**  All right.  Who is going to argue that for

26 | Plaintiff?  Mr. Goldstein?

27 |     **MR. GOLDSTEIN:**  Your Honor, first of all Plaintiffs bring

28 | this up at this point in time not so much as a motion that we

1  were requesting the Court consider and rule on at this time.  We

2  wanted to bring this to the Court's attention and to the

3  Defendants' attention so that we could later avoid any claim of

4  prejudice.

5      The basis for Plaintiffs considering this amendment are

6  facts and circumstances which have been part of this record from

7  the very beginning.  There's nothing new.  There's no new

8  evidence.  There's no new facts that the Defendant hasn't been

9  dealing with from the very beginning.

10     It's just that in light of the testimony that was elicited

11 from Defendants' expert -- or not expert, but person most

12 knowledgeable, and the documents that Defendant Union Carbide's

13 witness produced at their deposition a few weeks ago, and what

14 we anticipate and have been struggling to get from Montello for

15 the last three or four months, we anticipate that there will be

16 a sufficient showing on the part of Plaintiffs in their case to

17 warrant our adding this cause of action.

18     We're simply putting the parties on notice now so that we

19 can be cognizant of that and they can take the appropriate

20 measures of cross-examining witnesses at trial so that they are

21 not surprised when we bring to the Court's attention the fact

22 that we have introduced evidence sufficient to support this

23 cause of action and we wish to amend the complaint to conform

24 with the facts and the evidence.

25     That's why we're bringing it to the Court's attention now

26 and to the Defendants' attention at this time.  We did not mean

27 for this to be a full motion.  Had we meant it to be, we would

28 have attached the proposed amendment for the Court's

1  consideration, but this is rather a notice.

2      **THE COURT:**  Anything else?

3      **MR. GOLDSTEIN:**  No, not at this moment.

4      **THE COURT:**  Mr. Buddell?

5      **MR. BUDDELL:**  I guess procedurally I'm not quite sure how to

6  respond then because if it's not a motion, what are we talking

7  about?  I guess the first thing I would say is from a procedural

8  standpoint, they are required to attach the proposed amendment,

9  and they have not done so.

10      But that aside, this is a fairly significant issue.  Battery

11  is an intentional tort and goes literally 90 degrees from

12  anything else that's been alleged in this complaint.

13  Mr. Goldstein represented that there's no new evidence, no new

14  facts, that this has all been stuff that's been out there.  If

15  that's the case, why wasn't this amendment done long ago rather

16  than making these cryptic references to it two days ago that

17  there's this thing coming?

18      Come on.  This is sand-bagging.  If they've got the horses

19  to pull this freight, let's see them.  His suggestion that,

20  well, we just want to put them on notice so that they ask the

21  appropriate questions during cross-examination, how are we

22  supposed to figure that out?

23      And, more importantly, why are we willing to waste the time

24  of this jury and this Court asking questions for a cause of

25  action that may or may not rear its head at some point?  We

26  can't shadow box here, and that's what they're asking the Court

27  to force us to do.  There's no evidence that they have cited or

28  that exists to support such a claim, and allowing it at this

1  point is just ridiculous.

2      **THE COURT:**  Do you want to respond, Mr. Goldstein?

3      **MR. GOLDSTEIN:**  Your Honor, we intend to present the

4  evidence.  That's fully what we intend to do.  We don't intend

5  to do it here today.  We never intended to do it here today.

6  The predicate for this Motion to Amend is that there are no new

7  facts.  There's nothing surprising here.

8      The Defendant has been well aware of what their witness was

9  going to testify to when they produced them for deposition, and

10  the facts and the documents are in that deposition transcript.

11  And it's perfectly proper and normal for after presenting the

12  evidence at trial if the facts comport with a new cause of

13  action to seek to amend the complaint to conform to the facts.

14  That is what we intend to do if the facts play out that way.

15      .  We simply want the Court and the Defendants to be on notice

16  that that's the way we see these facts evolving.  And I'm

17  certain that after we see the Montello documents which are

18  supposed to be produced today, and we have an opportunity to

19  depose that witness, it will further support this cause of

20  action that we're proposing.

21      And if the Court will indulge, there's another point I would

22  like to bring up after that with regard to that deposition

23  production, but it's not germane to this topic right now.

24      **THE COURT:**  So, Mr. Buddell, what I'm hearing from

25  Mr. Goldstein is that this is a preemptive strike and that there

26  really isn't a motion pending, and they're not requesting a

27  formal ruling from the Court on this at this time.  Is that a

28  fair statement, Mr. Goldstein?

1     **MR. GOLDSTEIN:** Yes, Your Honor.

2     **THE COURT:** So there you have it.

3     **MR. BUDDELL:** I guess in response I'll give fair warning of

4 our intent that if this is alleged at some point, we will ask

5 for a mistrial so that we have time to continue this matter to

6 seek discovery, to conduct investigation and bring a motion for

7 summary adjudication as to this issue.

8     Again, all we hear is the witness, the facts, some

9 testimony, this stuff. He hasn't given a single specific. What

10 witness? What testimony? What facts? It's been quite a while

11 since I was in law school, and I don't quite remember all of the

12 elements of civil battery, but I do know it's an intentional and

13 harmful touching. I'm pretty dialed in to the facts of this

14 case, and I sure don't see it.

15     **THE COURT:** Yes, Mr. Goldstein.

16     **MR. GOLDSTEIN:** Your Honor, with regard to Defendant having

17 the right to bring a motion for summary adjudication, Defendant

18 will have ample avenues to avoid this cause of action by way of

19 the court denying Plaintiff's Motion to Amend and/or a motion on

20 Defendants' part for nonsuit on the question.

21     So it's not as if Defendant will be denied an opportunity to

22 challenge Plaintiff's facts, so I don't quite understand what

23 Mr. Buddell means by having to seek a continuance for purposes

24 of summary adjudication.

25     **THE COURT:** We're not at that bridge, and if we have to

26 cross it, we'll cross it. Anything else that Defendants would

27 like to put on the record?

28     **MR. BUDDELL:** The only other thing, Your Honor, is obviously

1    to the extent the Court has asked for things such as jury

2    instructions and so forth, that's going to impact that.  Not to

3    mention, if they're going to allege an intentional tort, they

4    may now try to open up the issue of punitive damages again

5    against Union Carbide which will be wholly improper.

6        **MR. BRAYTON:**  Your Honor.

7        **THE COURT:**  Yes, sir.

8        **MR. BRAYTON:**  If I may, to the extent that when the smoke

9    clears with respect to what has been determined otherwise in the

10   summary judgment, summary adjudication proceedings, Plaintiffs

11   will not seek to use this cause of action to perform an end-run.

12   If the bottom line out of that is that Plaintiffs are precluded

13   from pursuing punitive damages, on the state of the pleadings

14   presently, we're not going to use this as an avenue to seek an

15   end-run around that, just to make that clear.

16       **THE COURT:**  That seems pretty clear, Mr. Buddell.

17       **MR. BUDDELL:**  So we've got a stipulation at least as to

18   that.

19       **THE COURT:**  That's what I'm hearing, that this is not going

20   to be used as a means of reopening the door with respect to

21   punitive damages.

22       **MR. BRAYTON:**  If that door has been closed.

23       **THE COURT:**  Yes.  That is an important if.  Yes, ma'am.

24       **MS. MROWKA:**  I would just like to indicate for the record

25   that Montello joins in Union Carbide's argument and opposition

26   to Plaintiff's motion.

27       **THE COURT:**  Okay.  Yes, Mr. Brayton?

28       **MR. BRAYTON:**  There is one of Union Carbide's motions in

1    limine that I think might bear on -- that might arise with the

2    context of opening statement, and that is their Motion in Limine

3    10 to exclude mention of mesothelioma.  That's something I don't

4    know whether you want to deal with right now, but that's

5    something that should be resolved before then.

6        **THE COURT:**  I know that it's in there, but I haven't read

7    it.  If you want to speak to it now if either side can, I'm

8    happy to hear you, and then I'll let you know my decision.

9        **MR. BRAYTON:**  If the Court is otherwise intending to hear

10    arguments on other motions, at some other time we can do it

11    whenever the Court is going to be hearing the other motions.

12        **MR. BUDDELL:**  Unfortunately, your Honor, I'm not prepared to

13    argue that today.  With respect to the amendment one, I spent a

14    good deal of time looking at that, but the others I was kind of

15    deferring to tomorrow.

16        **THE COURT:**  Is the bifurcation motion one that we could

17    address this morning?  It seemed fairly straight-forward, and

18    any issues there?

19        **MR. BRAYTON:**  There's no opposition to the motion with

20    respect to the bifurcation of punitive damages, Your Honor.

21        **THE COURT:**  All right.  Anything you'd like to say?

22        **MS. MROWKA:**  No.  If they're not opposing our motion with

23    respect to the bifurcation, if they're not opposing the motion,

24    then...

25        **THE COURT:**  You'll accept.

26        **MS. MROWKA:**  Exactly.

27        **THE COURT:**  Good for you.  That's seems appropriate from my

28    point of view.  Yes, sir.

1    **MR. OSTHIMER:** Your Honor, just for the record, Freightliner

2    had joined in that motion, so it would apply to Freightliner as

3    well.

4    **THE COURT:** All right. So that motion from Montello is

5    granted.

6    **MS. MROWKA:** Thank you, Your Honor.

7    **THE COURT:** You're welcome. Are you in a position to argue

8    the in limine for the request to require a preliminary offer of

9    proof re punitive damages, counsel?

10   **MS. MROWKA:** I believe that we were going to argue those

11   tomorrow.

12   **THE COURT:** That may be correct. I'm asking whether you are

13   in a position to argue it now. I'm trying to use our time as

14   well as I can. I've read both of your sets of papers, so if

15   there were anything that you wanted to add.

16   **MS. MROWKA:** If Plaintiff's counsel would like to argue

17   that, that's fine. Let me just pull it out of my briefcase.

18   **THE COURT:** Plaintiff's counsel, are you ready to do that?

19   Look, these are fairly standard. You guys must have your

20   arguments, know them frontwards and backwards.

21   **MR. BRAYTON:** In the can, Your Honor. It's their motion.

22   **THE COURT:** So you're ready to respond to it?

23   **MR. BRAYTON:** If necessary, or just submit the matter.

24   **THE COURT:** All right, counsel for Montello.

25   **MS. MROWKA:** Thank you, Your Honor. With respect to this

26   motion, I believe we set out with some specifics the reasons why

27   we're bringing it and we're asking for the preliminary showing,

28   and that is based upon the, first of all, fundamental lack of

1  product identification by Plaintiffs and also based upon the

2  facts that their state of the art expert has no opinions as to

3  drilling mud, the state of the art and the knowledge as to

4  asbestos with respect to drilling muds.

5      And also he has no file on Montello, so basically what we're

6  saying here is that how we look at the case right now and the

7  admissible evidence, there isn't any, less alone clear and

8  convincing, evidence of punitive damages, so we're asking that

9  the Plaintiffs make a preliminary showing.

10     **THE COURT:**  Who is arguing this for Plaintiff?

11     **MR. BRAYTON:**  I would, Your Honor.  Just very briefly.

12  Carried to the logical and absurd end, Section 402 could be

13  utilized to require a trial, an entire trial to precede the

14  entire trial and effectively be used, as attempted to be done

15  here, to allow for further discovery and preparation on the part

16  of Defendants.

17     They had their opportunity to inquire into what evidence we

18  have through discovery process.  The state of what they have is

19  what they have.  If there is a determination that evidence that

20  we go forward with is somehow, A, inadequate at the time that

21  it's presented, they can make an appropriate objection.

22     If it somehow is contradictory to what's been produced in

23  discovery, they can seek whatever remedy may be available to

24  them or make whatever argument they choose with respect to that.

25  There's simply no basis to require that Plaintiff go forward and

26  pre-prove everything that they will already be proving.

27     **THE COURT:**  Anything else you'd like to say in response?

28     **MS. MROWKA:**  Yes.  I think that based upon the fact that

1  having a bifurcated trial on punitive damages, it would

2  necessarily extend the length of the trial and would also

3  prevent certain jurors who couldn't make those kind of time

4  commitments from serving.

5      I think that it's important that they be required to make an

6  upfront showing that they actually have clear and convincing

7  evidence of punitive damages prior to making the Court expend

8  all that additional time and prevent some jurors from serving

9  who otherwise could because of the extension of time it would

10 take.

11     And I don't believe that they have the evidence.  That's why

12 we're bringing the motion.  We think the Court should require

13 them to make a showing.

14     **THE COURT:**  Anything else, Counsel?

15     **MR. BUDDELL:**  Your Honor, could I join in this?  Even though

16 we've got the issue of punitive damages I guess hanging out

17 there as to us, and I think we're comfortable with that, even if

18 that is indeed resolved in our favor, Union Carbide joins in

19 Montello's motion here because I think to an extent that

20 punitive damages are discussed at all, there's a certain impact

21 as to all defendants.

22     I think asking for an offer of proof is justified in this

23 instance.  It's not asking for a trial before trial.  Punitive

24 damages are a very significant and unique form of damages, if

25 nothing else because of the higher burden of proof that they

26 carry.

27     It's not at all unusual for courts to require such an offer

28 before we get started because of the potential impact that it

1  can have on the trial, notwithstanding things like extending the

2  length and disqualifying jurors who would otherwise be qualified

3  to sit for the trial.

4      Clearly if they have got evidence of punitive damages

5  against the Defendant, what be it Union Carbide or Montello or

6  any other defendant, it would seem reasonable that they could

7  make even a cursory mention of that that would carry the burden

8  before your Honor today rather than trying to hide in the

9  shadows and saying, "Well, we're going to show them.  We'll see

10  what."

11      It is appropriate, and it is not some unusual instance and

12  this isn't required in asbestos cases in particular all the

13  time.

14      **THE COURT:**  Yes, sir.

15      **MR. OSTHIMER:**  Your Honor, on behalf of Freightliner, we

16  join in the motion.  And as Your Honor pointed out earlier, the

17  memorandum regarding the causes of action, you can't tell

18  against whom they're asking punitive damages.

19      It's merely a generic statement, so if they're not asking

20  for punitive damages against Freightliner, this isn't my fight

21  so I can't tell, But I join if they are going to ask for

22  punitive damages against Freightliner.

23      **THE COURT:**  Why don't we get clear on the record from

24  Plaintiffs at this point.  I know you haven't heard from me

25  about my view of what happened at the Law and Motion Department,

26  but does your statement of causes of action with respect to

27  seeking punitives apply to all defendants currently still before

28  the court?

LAURA MARTINEZ, CSR NO. 11332

1    **MR. BRAYTON:** The Plaintiffs expect only to be pursuing

2    punitive damages as against Union Carbide and Montello, Your

3    Honor.

4    **THE COURT:** So you're out of that fight.

5    **MR. OSTHIMER:** Thank you, Your Honor.

6    **THE COURT:** So that's currently the Plaintiff's view,

7    subject to possible modification from me.

8    **MR. BRAYTON:** Correct, to the extent allowed.

9    **THE COURT:** All right. Were you about to say something over

10    here, Counsel?

11    **MR. BUDDELL:** No, Your Honor. There again, just echoing

12    what I said before.

13    **THE COURT:** Okay.

14    **MR. BUDDELL:** And with respect to the issue of Union

15    Carbide, Your Honor, I only have one copy, but I'd be happy to

16    provide that to Your Honor of the transcript of the hearing.

17    **THE COURT:** I'd like to take a look at it, so I'd appreciate

18    having it lodged with Mr. Chuck before you leave.

19    **MR. BUDDELL:** Sure, and I will show it to counsel before I

20    do that.

21    **THE COURT:** All right. That's a good idea. I think that

22    takes care of Montello's motions in limine; is that true?

23    **MS. MROWKA:** Yes, that's correct, Your Honor. We have

24    joined in Union Carbide's, but those are the only two of our

25    motions.

26    **THE COURT:** Your In Limine No. 1 is granted which was the

27    one requesting that you join in your comrade's motions that are

28    pending.

1    **MS. MROWKA:**  Thank you.

2    **THE COURT:**  Now I would hope that we could have you argue

3  now the proximate cause in limine from Plaintiff.  That is tried

4  to true and is classic here.  Is there any reason why we

5  couldn't deal with that right now?

6    **MR. BUDDELL:**  Well, Your Honor, I actually haven't looked at

7  it.  To the extend that I know that it's routinely denied.

8    **THE COURT:**  Plaintiff's Motion to Preclude Examination of

9  Expert Witnesses regarding Proximate Cause.  Is there any reason

10  why we couldn't deal with this?

11    **MR. BUDDELL:**  Your Honor, I don't even have the motion in

12  front of me.  To be honest with you, I had not prepared at all

13  for that today.

14    **MR. BRYDON:**  Your Honor, in all due respect, I can argue

15  that motion.  I have argued this motion many times.  I guess the

16  question is is deferring to Mr. Jordan who I think was going to

17  be here tomorrow to argue it.

18    **THE COURT:**  Let's go ahead and argue it.

19    **MR. BRYDON:**  All right.

20    **THE COURT:**  So that is Plaintiff's motion.  Is there

21  anything that you all would like to add to the papers that you

22  filed?

23    **MR. GOLDSTEIN:**  Not really, Your Honor.  I believe the

24  papers reflect Plaintiff's position clearly.  I'd simply want to

25  underline the fact that what we're seeking here is really an

26  admonition from the Court precluding or warning Defendants'

27  witnesses and Defense counsel that the standard here is

28  substantial factor.

1    It's not "but for," and questions that frame the facts or

2    the issues in such a way that it appears to the jury to be a

3    "but for" test is nothing but prejudicial and it's inappropriate

4    under 350 and 352.

5    **THE COURT:** Thank you.

6    **MR. BRYDON:** Your Honor, the whole issue of substantial

7    factor doesn't have a precise definition in terms of the jury

8    instructions. They're basically told that it's something that's

9    not trivial. They're also told that it may be something to

10   which a medical expert could say to a reasonable degree of

11   medical probability would increase the risk in this case of lung

12   cancer.

13   The jury ultimately has to make the decision as to whether

14   or not an exposure meets those criteria as of being trivial or

15   something that in reasonable medical probability is going to

16   increase the risk.

17   This Court I would presume is going to properly instruct the

18   jury on the law. That is the remedy for this particular motion.

19   But to say that I or Mr. Jordan could not get up here and

20   cross-examine their experts, in terms of the relative impact of

21   all of the exposures that there are in this case --

22   And just to give a preview here, one of the major exposures

23   in this case was the fact that the father worked at the Boston

24   Navy Shipyards, was basically an insulator/pipe fitter, and this

25   boy would meet his father almost every day, when he came home

26   with a significant amount of dust.

27   I would expect Dr. Hammer, who is being deposed this

28   morning, is going to answer the following question in the

1  affirmative:  Would that exposure in your estimation,

2  Dr. Hammer, be sufficient to have caused this gentleman's lung

3  cancer?

4      His answer to that question is going to in all likelihood be

5  in the affirmative, because he's going to think that once you've

6  got somebody who has developed some form of pleural disease and

7  has that evidence, that that's a sufficient exposure in

8  combination with smoking history to give rise to a lung cancer.

9      To box us in and say we can't ask those types of questions

10  deprives the jury of the opportunity of understanding the

11  qualitative comparison of the kinds of other exposures this

12  gentlemen has had to the only alleged exposure in this case to

13  anything that has anything to do with Union Carbide which is the

14  issue of possible exposure to drilling mud as a bystander.

15      Because, as the Court will learn in this case, the Plaintiff

16  in this case never used a Montello product.  All he ever did,

17  based on his refreshed recollection, is be around in an oil

18  field outside in Bakersfield or in Southern California drilling

19  muds that might have been used by others.  And as the Court will

20  learn, certain drilling muds in this case are usually used in

21  exploration, and Mr. Lyman was basically only involved in

22  production.

23      We believe the Defense is going to show that there is very

24  minimal outdoor exposure in areas hundreds of feet away from

25  where Mr. Lyman was ever working.  This jury has to decide

26  whether that is substantial.

27      Their experts are going to come in and likely say every

28  exposure is probably going to be contributory to a lung cancer

1   when you've got this kind of smoking history, and we have to be

2   able to explore all those alternatives, present all the various

3   views of this evidence so the jury can decide whether it's

4   substantial or not.

5       I do not expect a lawyer to say in opening statement or in

6   closing that you should apply a "but for" test, that they're

7   trying to limit the way in which we elect to cross-examine

8   experts to help this jury make the determination as to whether

9   the exposure to this Montello-Union Carbide manufactured product

10  had anything to do with this gentleman's lung cancer.

11      And that's what this motion is designed to do.  The remedy

12  is the jury instruction, not to affect us in terms of how we

13  cross-examine our witnesses.

14      **THE COURT:**  Thank you, Counsel.  Anything you'd like to add?

15      **MR. GOLDSTEIN:**  Only, Your Honor, that if the questions are

16  framed in the way that Mr. Brydon proposes, it clearly sends a

17  message insinuated to the jury, "You need not look any further.

18  This was the cause.  You can ignore the other exposures."

19  Submitted.

20      **THE COURT:**  Anything further?

21      **MR. BRYDON:**  Nothing further.

22      **THE COURT:**  Yes, ma'am.

23      **MS. MROWKA:**  Just to indicate that Montello joins in the

24  arguments presented by Union Carbide.

25      **THE COURT:**  All right.

26      **MR. OSTHIMER:**  As does Freightliner, Your Honor.

27      **THE COURT:**  Thank you.  Is this one submitted?

28      **MR. GOLDSTEIN:**  Submitted.

1    **THE COURT:**  Good.  We're making headway.  I think the other

2  motion from Plaintiff was the in limine to preclude reference

3  regarding background or ambient exposure to asbestos.

4  Mr. Goldstein, anything you want to add to what you've put in

5  writings for the Court?

6    **MR. GOLDSTEIN:**  Similar to the last motion, Your Honor, this

7  one is well covered in the papers.  Just in summary, I believe

8  it's safe to state that Defendant will not produce any evidence

9  anyone that will testify that any background or ambient exposure

10  would have been an underlying cause of Mr. Lyman's asbestos

11  related diseases; therefore, even bringing it up is prejudicial

12  and irrelevant under 350 and 352.

13    **MR. BRYDON:**  Your Honor, this is the exact flip side of the

14  prior motion where the defense needs to let this jury know how

15  massive alternative exposures compared to the very minimal or

16  trivial exposure that involves Defendant's product in this case.

17    Taking that one step further, we expect there's going to be

18  evidence from industrial hygienists and medical experts from the

19  Defense in this case that the amount of exposure that could have

20  possibly occurred in these oil fields, if there was any drilling

21  muds that contain asbestos being used in the vicinity of this

22  Plaintiff, was probably less than the normal background and

23  ambient levels of exposure one would get living, for example, in

24  the city of San Francisco.

25    That has significance in that we believe -- again, I'm sure

26  Sam Hammer is agreeing with this because he agrees with it all

27  the time, that there is no evidence that exposures to background

28  or ambient levels of asbestos increase anybody's risk of getting

1   lung cancer.  That being the case again gives the jury something

2   by which to measure substantial factor, whether or not a

3   particular exposure is that trivial exposure that does not to a

4   degree of reasonable medical probability increase the risk of

5   lung cancer or is it something that is substantial.

6       Again, that is evidence that I think needs to be before this

7   jury, because the industrial hygiene evidence will be that the

8   amount of exposure if there was any exposure to a Union Carbide

9   product in this case would have been below a gentlemen's

10  lifetime background of ambient exposure, and that does not

11  increase anybody's risk of getting disease.

12      **MR. GOLDSTEIN:**  The inherent problem, Your Honor, in that

13  argument is that the Defense will never produce any

14  documentation evidencing what the ambient or background exposure

15  is.  No measurements.  And we all know that it is vague.  It is

16  vague as to location and time.  It depends where the measurement

17  is taken and when in time a measurement was taken.

18      I guarantee you that the asbestos, if there is an ambient

19  level out on the street corner today, is far different than it

20  was 30 or 40 years ago.  Submitted.

21      **THE COURT:**  Anything else?

22      **MR. BRYDON:**  Yes.  I would just respond that, again, I

23  believe Plaintiff's own expert, Dr. Sam Hammer, will agree that

24  there are studies out there, particularly those that have been

25  published by Andrew Churg, that talk about measurements of

26  ambient background exposures.

27      Because they have been able to establish that people who

28  have had no occupational exposure to asbestos have as many as 20

1   asbestos bodies within their lung, and when you go in and you

2   find an asbestos body in dry lung tissue during an autopsy,

3   unless it exceeds essentially I believe it is 20 bodies per dry

4   gram of lung, that they don't consider that to be an

5   occupational exposure because everybody is going to have an

6   exposure to asbestos, and you would expect to find asbestos

7   bodies.

8       So I believe industrial hygienists can make that

9   quantitative determination.  They can go to studies such as the

10  studies that are in the published literature that you will find

11  in Andrew Churg's text on pathology and be able to do that, and

12  we believe William Dyson will be able to do that in this case.

13      So I believe I've made a good faith showing as to some of

14  the evidence that I believe the Defense will present, so the

15  issue of understanding that background exposures do not increase

16  the risk of disease is an important piece of evidence in the

17  case.

18      **MS. MROWKA:**  Montello joins in Union Carbide's arguments.

19      **THE COURT:**  Well said.  All right.  Mr. Goldstein, was there

20  something further -- oh, counsel behind you I think wishes to

21  join.

22      **MR. OSTHIMER:**  Yes.  On behalf of Freightliner, I join in

23  Union Carbide's argument.

24      **THE COURT:**  Yes, Mr. Goldstein.

25      **MR. GOLDSTEIN:**  If Mr. Brydon is suggesting that one of his

26  witnesses will testify as to what the ambient background

27  exposure was for Mr. Lyman and quantify that in court, we

28  anxiously await that testimony.

1       MR. BRYDON:  Just so I can clarify, that was not the

2   representation I made.  The representation I made is that our

3   experts will be able to quantify that whatever exposures that

4   came from Montello products used in the oil fields of Southern

5   California is below reported background levels of exposure and

6   that medical experts such as Dr. Hammer will testify that that

7   background level of exposure does not increase the risk of lung

8   cancer.

9       MR. GOLDSTEIN:  And the question, Your Honor, is:  What

10  background exposure, where and when it's below?

11      THE COURT:  All right.  Lots of questions to be hopefully

12  answered at a future time.  Are we ready to submit on this one?

13      MR. GOLDSTEIN:  Submitted.

14      MR. BRYDON:  Submitted, Your Honor.

15      THE COURT:  So I think we've had argument on everything that

16  had been identified by you all as being important prior to any

17  opening statements; is that a fair statement?

18      MR. BUDDELL:  With the exception of the mesothelioma motion

19  that we brought, Your Honor.

20      THE COURT:  Okay.

21      MR. BRYDON:  And maybe I can address that as well.  If I

22  could understand what Mr. Brayton's concern is out of that, the

23  basic thrust of our motion is we don't want this jury to hear

24  evidence that this plaintiff, for example, is living in fear of

25  the fact that he has a risk of getting mesothelioma.

26      I mean, he's a gentlemen that is in terminal stage lung

27  cancer and I don't think any doctor is going to say that he is

28  at risk of getting mesothelioma.  We therefore say why do we

1  need to talk about mesothelioma in the case when this is a lung

2  cancer case?  That is the thrust of our motion.

3      **THE COURT:**  All right, and maybe there was no intention or

4  expectation of talking about it, but let's hear from

5  Mr. Brayton.

6      **MR. BRAYTON:**  Counsel is correct, Your Honor, that we don't

7  intend to put on evidence that Mr. Lyman fears getting

8  mesothelioma.

9      **THE COURT:**  All right, so is this a moot point then?

10     **MR. BRAYTON:**  No.  No, because what they're asking is that

11 mesothelioma not be mentioned at all, or they suggest, they just

12 make the bald assertion that if you breathe the word

13 mesothelioma in front of a jury that all sorts of horrible

14 things will happen.

15     Our point is that whatever a juror may know about

16 mesothelioma, it will pale or only equal what they come to learn

17 about what Mr. Lyman is going through.  Mesothelioma is no worse

18 a disease than what they're going to be confronted with in the

19 evidence with respect to Mr. Lyman.  And it is relevant, and I

20 don't know whether the Court has had the opportunity to go

21 through our papers.

22     **THE COURT:**  I have not yet.

23     **MR. BRAYTON:**  Okay.  What we essentially say is that there

24 are bases for discussion of mesothelioma as it relates to the

25 carcinogenic properties of asbestos.  As the Court probably

26 knows, mesothelioma is susceptible to being caused by very low

27 exposures to asbestos and exposures that do not involve the

28 manifestation of any other asbestos related disease.

1      One of the positions that is frequently taken by the Defense

2   medical experts is that one cancer may only be attributed to

3   having asbestos as a contributory cause in the circumstance

4   where there is also asbestosis present.  And many of those

5   experts in fact say that it is the asbestosis, the fibrotic

6   response which is the mediator of the cancer, the causative

7   agent.

8      We have experts that are of a contrary view, and one of the

9   primary supports for that is it's clear that asbestos has the

10  capacity to cause cancer, mesothelioma, which is absolutely an

11  asbestos cancer, in the absence of any fibrotic response, in the

12  absence of what is claimed to be the mediator in the lung cancer

13  circumstance.

14     The other relevance of mesothelioma is that as of the early

15  60s mesothelioma was understood, the relationship to asbestos

16  was understood and that that asbestos caused mesothelioma at

17  levels far, far below those that are deemed necessary to produce

18  asbestosis, for example.

19     Defense relies on either the regulatory standards or the

20  pre-existing recommendations regarding exposure levels that were

21  enacted, set up in response to the risk of asbestosis.  The

22  circumstance of mesothelioma as it was apparent to anybody who

23  bothered to look at least by 1964 is, hey, they were on notice

24  that very, very low and much lower levels of exposure to

25  asbestos were dangerous way back, decades before Mr. Lyman was

26  exposed in the 1980s.

27     **THE COURT:**  Okay.  Thank you.

28     **MR. BRYDON:**  I think that's a good operative definition you

1  just heard as to why we don't want mesothelioma to get in this

2  case.  Look at all the things he wants to talk about that have

3  nothing to do with lung cancer.  Lung cancer requires high

4  levels of exposure to asbestos, particularly when it's involved

5  with an individual that's got the 100-year pack history that

6  Mr. Lyman has with respect to cigarette smoking.

7      This is a case of a smoker who may have had some exposure to

8  asbestos and contracts lung cancer.  This jury has to focus on

9  the issue of whether or not exposures in this case were

10  sufficient to even have asbestos be a contributor to the lung

11  cancer before it even gets to the issue of what contribution if

12  any the remaining defendants have in the case.

13      He talks about, well, look.  Look how easy it was in 1960

14  when they started learning that it didn't take a lot of exposure

15  to get mesothelioma.  What does that have to do with this case?

16  It has absolutely nothing to do with this case.  You can get

17  mesothelioma without having any fibrotic response.

18      There is a whole medical debate in this case as to that

19  issue being involved with lung cancer.  That is going to get

20  discussed in this case.  They want to start focusing the jury's

21  attention away to look at this type of cancer that could be

22  caused by exposure to asbestos that takes just a little bit of

23  exposure when concededly that's not the issue with lung cancer.

24      This is going to cause confusion.  It's going to cause

25  prejudice.  Why don't we start talking about stomach cancer?

26  Why don't we start talking about other kinds of cancers in this

27  case?  No.  They just want to introduce mesothelioma because it

28  is a very important buzz word.  It is not important to any issue

1   that this jury needs to decide to be educated on the health

2   effects of asbestos related to a disease that is not at issue in

3   this case.

4       If asbestosis is at issue in this case, they could talk

5   about that.  If there's a pleural plaque in this case, they

6   could talk about that.  If there's lung cancer, they could talk

7   about that, but they shouldn't talk about mesothelioma just like

8   they shouldn't talk about stomach cancers, just like they

9   shouldn't talk about any other kind of throat cancers.  They

10  don't have anything to do with this case.  It's going to prolong

11  this case, and it's going to confuse this jury.

12      And mesothelioma is a very, very charged word.  I mean,

13  there's a considerable amount of advertising, and I think we're

14  going to find out if we ask these jurors, "Have you ever seen

15  any advertising on TV," everybody is going to know the Sokoloff

16  commercials because they're all over the air waves.  It's a

17  highly charged thing.  Everybody has seen if you've got

18  mesothelioma, call this number.

19      That's not what this case is about, so I think Mr. Brayton

20  has made my point for me.  They want to introduce this highly

21  charged issue into this case.  They are not making a claim for

22  fear of mesothelioma because they really can't, and it's a lung

23  cancer case.  Let's talk about lung cancer.

24      Let's not talk about mesothelioma.  They don't need to hear

25  about mesothelioma, and we don't need to have medicine on

26  mesothelioma.  Let's have the medicine on plaques, asbestosis

27  and lung cancer and try the case that's before the Court.

28      **THE COURT:**  Anything else?

1      **MS. MROWKA:**  Montello joins in Union Carbide's arguments.

2      **MR. OSTHIMER:**  As does Freightliner, Your Honor.

3      **THE COURT:**  Mr. Brayton or Mr. Goldstein?

4      **MR. BRAYTON:**  Just very briefly, Your Honor.  The actual

5  potential for any prejudice by mention of mesothelioma in view

6  of what we're actually dealing with here is minimal to nil, and

7  it's highly probative, as I've indicated.  I've only touched on,

8  I haven't gone in depth as to how Plaintiff's experts interplay

9  what they understand about cancer causation from mesothelioma as

10  it can be generalized to asbestos potential for cancer

11  causation.

12      Counsel has got it completely backwards with respect to that

13  you need more asbestos if someone is a smoker to show causation.

14  In fact, the relationship between smoking and asbestos is that

15  there is a synergistic effect and that when you have a smoker

16  exposed to asbestos, you can get lung cancers with less smoking

17  and less asbestos than you would with smoking or asbestos

18  considered separately.  So that's not right.

19      And finally, of course, the completely independent

20  Defendants in this case knew in the 1960s that low, much lower

21  levels of asbestos exposure were dangerous than was previously

22  understood as it related to asbestos.  That impacts the

23  reasonableness of their conduct with respect to what they did to

24  prevent exposures or warn people about the dangers or the

25  hazards of asbestos with their products.

26      And you can't talk about that and have an understanding of

27  why they should have appreciated and attended to lower levels of

28  exposure without an explanation of why that was significant.

1  Thank you.

2      **THE COURT:**  Submitted?

3      **MR. BRAYTON:**  Submitted.

4      **THE COURT:**  Submitted?  Or do you want to say something

5  more?  I'll let you say something more.

6      **MR. BRYDON:**  The only thing I just want to respond to is

7  this notion about low versus high levels, and I will just say

8  it's their own expert, Dr. Sam Hammer, who will come in here and

9  testify that he has got to see a sufficiently high dose of

10 asbestos exposure that at least, this is what he used to testify

11 to, would be sufficient to cause pathologic asbestosis.

12      He's now backtracked a little bit and say at least enough to

13 cause a plaque.  He does require a significantly higher exposure

14 to asbestos before he will make a causal link that asbestos

15 plays a role in a lung cancer.  He does not do that with

16 mesothelioma.  They're two different diseases.

17      I'm not making this up.  It's from their own experts, and

18 I've cross-examined Dr. Hammer on numerous occasions on that

19 point.  Submitted.

20      **THE COURT:**  Submitted?

21      **MR. BRAYTON:**  I trust the Court understands that that wasn't

22 the Plaintiff's point.

23      **THE COURT:**  All right.  My favorite phase I think in this

24 courtroom is "one last thing."  All right.  So let's talk about

25 next steps and what's going to happen when so we can have it be

26 as clear as possible.  But I gather Mr. Goldstein has one last

27 thing.  Mr. Goldstein.

28      **MR. GOLDSTEIN:**  Your Honor, I alluded to this earlier when

1   we were having a discussion.  There's a question that I am

2   hoping to head off at the pass right now so that it doesn't

3   prolong this pretrial work.

4        The Court may be aware that Commissioner Chan ordered the

5   production of documents by Montello to go forward today, and as

6   we speak, I have people in Tulsa making copies of the Montello

7   documents.  Yesterday afternoon I received a fax from

8   Mr. Hartman, national counsel for Montello, informing me that he

9   was not going to turn over photographs of the Montello products

10  to me as he had produced them previously in the Rakestraw

11  matter.

12       I immediately stopped what I was doing.  I searched the

13  entire transcript, looked through 386 pages of exhibits, wrote

14  him back, said, "Mr. Hartman, I can't find pictures in

15  Rakestraw.  Point me to the exhibit in the transcript."

16       His reply was a letter saying, "Oops.  I'm sorry.  Accept

17  our apologies.  We didn't mean we gave them to you in Rakestraw.

18  We meant we are not going to give them to you because you seem

19  to have them already."

20       And my response to him was, "Sir, Commissioner Chan's order

21  did not preclude or exclude your production of anything.  I'm

22  entitled to the photographs.  I will pay the appropriate costs

23  of reproducing them photographically if necessary.  Tell me how

24  much it is, but please produce them.  Don't delay this process

25  any longer."

26       I have not heard back from him since I sent that last night,

27  and I trust that he's going to produce those photographs today

28  in the production of documents.

1  **THE COURT:**  I hope your trust is well placed.

2  **MR. GOLDSTEIN:**  I'm simply asking the Court to render an

3  advisory instruction, if you might.

4  **THE COURT:**  How long do you want to be here today?  I'm sure

5  counsel for Montello having heard this for -- I don't know if

6  this is the first you've heard of it.

7  **MS. MROWKA:**  This is the first I've heard of portions of

8  what he was saying, and I did get a letter after 5:00 p.m. last

9  night requesting a response by 5:00 p.m. last night.  I sent him

10  a letter back saying I anticipated that Mr. Hartman would get

11  back in contact with him today.

12  **THE COURT:**  Well, you all are officers of the court.  You

13  know what's required.  I assume what needs to be done will be

14  done, and if there is action that needs to be taken at a future

15  time you can request that it be taken.  Okay.  So everybody has

16  been informed.

17  So, one, you're meeting and conferring, and you're going to

18  have what I hope will be an agreed upon questionnaire subject to

19  final approval by the Court to the Court, courtesy copy, hard

20  copy no later than 3:00 o'clock this afternoon.

21  Two, meet and confer and go through all of Union Carbide's

22  motions, those are the only other defense motions that I'm aware

23  of that are out there, and advise me by 3:00 o'clock this

24  afternoon of what you've agreed upon subject to my agreement

25  with your agreement.

26  And then we'll have a better sense for tomorrow of what

27  needs to be addressed.  Am I seeing frowns?  Are we clear?  So

28  you're going to meet and confer on those two subject matters.

1  Then we're going to meet tomorrow, and we will nail down the
2  questionnaire, talk about any remaining in limines that you
3  haven't agreed to or that I have some concern about.  And I will
4  give you my rulings on what I've heard today.

5      And it is currently my expectation, subject to confirmation
6  tomorrow that we will be advising our jury folks that they need
7  to bring in a passel of jurors for Monday morning to begin the
8  hardship process.  And it will be my hope that we can have 007
9  available to us, and if we don't have that, in lieu of that, is
10 it 509?

11     **THE CLERK:**  509, Your Honor.  That's the large courtroom on
12 the fifth floor.

13     **THE COURT:**  In which we can get the jury selection under
14 way.  I'd like to confirm this morning that somebody wanted
15 dailies, is that correct, because we need to check in with our
16 reporter office to make sure that we can make that happen.  Is
17 that still what's wanted by at least one party here?

18     **MR. BUDDELL:**  Yes, Your Honor.  Union Carbide requests
19 dailies.

20     **THE COURT:**  All right.  So we will begin to explore that.
21 And Plaintiffs are going to be in charge of making orders for
22 refreshments for our jurors, but everybody is participating in
23 that, as I recall.  Was that my correct understanding?

24     **MR. BUDDELL:**  Yes, Your Honor.

25     **MR. GOLDSTEIN:**  That's correct.

26     **MR. BUDDELL:**  And tomorrow is 10:00 a.m. as well; correct?

27     **THE COURT:**  Yes.  Will you be with us?

28     **MR. BUDDELL:**  I will not.

1    THE COURT: Dang. Do you have a rehearsal to go to,
2  Mr. Buddell?
3    MR. BUDDELL: I actually do, and yes, I'll be -- I could be
4  in a state other than stellar tomorrow given certain goings on
5  that may occur tonight.
6    THE COURT: We'll inquire further about that later.
7                    (Laughter.)
8    I don't recall that I had received witness lists. Am I
9  correct about that; have those been filed or provided to both
10  sides?
11    MS. MROWKA: Montello filed theirs on Tuesday, I believe.
12    THE COURT: Was there a courtesy copy provided to the Court?
13    MS. MROWKA: I believe so.
14    THE COURT: All right. I'll check and see. What about
15  Union Carbide?
16    MR. BUDDELL: We did as well. We also received Plaintiff's
17  witness list.
18    MR. OSTHIMER: Freightliner did as well.
19    THE COURT: So I'll double check. It may be there in my
20  massive piles of paper. I just want to make sure that that's
21  been accomplished.
22    MR. BUDDELL: One thing I noted, your Honor. Maybe this is
23  a source of some of the confusion. I noticed with respect to
24  the motion for the teleconference business, Plaintiffs were
25  putting Room 610 on theirs. We caught it because we did it on
26  one of our motions.
27    THE COURT: Yes. I did note that. It was confusing. 610 I
28  think is the Commissioner's Department; isn't that right?

1      **MR. GOLDSTEIN:** Yes, Your Honor. I think that was something

2   remaining from the original ex parte before the Commissioner.

3      **THE COURT:** All right. So let's try to nail down these

4   little fine points that cause the rest of us to go running

5   around chasing our tails. That would be greatly appreciated.

6      And I know that you all churn these papers out on a regular

7   basis. Let me just say everybody needs a better copy editor.

8   There are numerous references in Plaintiff's papers to the

9   decedents, and I don't think that's applicable in this

10  particular matter, at least not yet.

11     And there are occasional -- we'll let's just say you all

12  haven't been in front of me before. I do read what you submit,

13  and I read it closely, so for future reference, pass it along.

14     Anything else in terms of either the motions that are before

15  me, any logistics, any questions that anybody has, we will have

16  another opportunity tomorrow to address issues. But if there's

17  something you'd like to raise now, I'm happy to hear from you.

18     **MR. BRYDON:** Your Honor, you had requested submission of

19  jury instructions and proposed special verdict forms. Obviously

20  with the issues that are hanging out right now, I don't think

21  that there's any way we can do that.

22     **THE COURT:** I concur. So that can be on hold, and it would

23  be my hope that we can have a date certain tomorrow on which

24  those should be submitted, because you'll have rulings that will

25  enable you to focus in on those issues. That's a fair inquiry.

26  Anything else from anybody?

27     **MR. GOLDSTEIN:** Excuse me, Your Honor?

28     **THE COURT:** Yes, sir.

1    **MR. GOLDSTEIN:** Did I miss the time for Monday morning?

2    What time will we be gathering for jury hardship?

3    **THE COURT:** In all likelihood it would go as follows:

4    Counsel would be ordered present here at 9:00 o'clock at the

5    latest to be confirmed tomorrow, just to make sure that we're

6    all present and accounted for and that your expectation would be

7    that we will proceed down to or up to, depending on where we

8    are, for conversation with the jury panel at about 9:30 or so.

9        And you'll recall that I asked you all to have a no more

10   than three-minute statement, and all it is, it's a mini opening

11   of what the evidence is going to show. This is your opportunity

12   to tell these jurors why they should be just busting their

13   buttons with delight to be on this jury. I want you to make it

14   interesting and certainly following any rulings that have been

15   made by the Court with respect to in limines that have been

16   discussed.

17       And the other thing that we will need to talk about tomorrow

18   will be nailing down the time estimate in light of what you

19   understand my availability to be and allowing for sufficient and

20   what I call my glitch time that we build in, because there's

21   nothing better than a happy jury that finishes before they were

22   anticipating.

23       So I want it to be real, but to build in a little bit of

24   time. And now that you've exchanged your witness lists, I would

25   hope that that would help you nail that down and be as precise

26   as you can.

27       And I mentioned to you when we first met that there's always

28   a challenge with asbestos cases or any lengthy case that's a

LAURA MARTINEZ, CSR NO. 11332

1  given, and we have built in here the end of August people's

2  often combination of family vacation as well as going back to

3  school and what that means for individuals, a lot of transitions

4  going on at this time of year so that that can make it more of a

5  challenge.

6      All the more reason why having compelling statements from

7  you to elicit the interest of these folks.  I think often people

8  when they hear "asbestos," they really don't know what that

9  means.  They all go "ugh."  But jurors learn a lot and I think

10  really find it quite interesting, so I'd like you to try to

11  tickle that interest to the best of your respective abilities.

12  As I said, only three minutes.  I will cut you off if you go

13  over it.  Okay?

14      **MR. BUDDELL:**  Following the mini openings, Your Honor, I

15  remember in Vanderhyde you had said that you didn't have counsel

16  present after that.

17      **THE COURT:**  I don't require that you be present while I do

18  the hardships.

19      **MR. BUDDELL:**  Do you have any objection to counsel being

20  present, though?

21      **THE COURT:**  You can be, but that's my decision based on what

22  the law requires, and I want to move it along so that we can

23  complete it and have the jurors available for possible other

24  panels if for one reason or another they're not appropriate for

25  this case.

26      Oh, don't yawn, Mr. Brayton.  We're going to catch you.  If

27  you watched the Giants last night, did you happen to note that

28  they were zeroing in on various people around the ball field who

1  were yawning.  It was quite interesting.

2      (Discussion off the record.)

3      So tomorrow at 10:00, and 3:00 o'clock questionnaire and any

4  motions that we need to have argument about tomorrow.  I want to

5  know so that I can prepare.  And as you all know, bench officers

6  greatly appreciate it when you meet and confer and you can reach

7  agreement.  It doesn't make us happy when we're asked to do work

8  which later everybody walks in and says, "Oh, we've agreed to

9  all that some time ago."  Okay?

10      All right.  So good luck to you in your conversations, and I

11  will see you tomorrow at 10:00 a.m., and thank you.  And let's

12  go off the record.

13      (Proceedings adjourned at 12:17 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  State of California      )
                                )
2  County of San Francisco  )

3

4

5     I, Laura Martinez, Reporter Pro Tempore for the Superior

6  Court of California, County of San Francisco, do hereby certify:

7     That I was present at the time of the above proceedings;

8     That I took down in machine shorthand notes all proceedings

9  had and testimony given;

10     That I thereafter transcribed said shorthand notes with the

11  aid of a computer;

12     That the above and foregoing is a full, true, and correct

13  transcription of said shorthand notes, and a full, true and

14  correct transcript of all proceedings had and testimony taken;

15     That I am not a party to the action or related to a party or

16  counsel;

17     That I have no financial or other interest in the outcome of

18  the action.

19

20

21  Dated:  August 9, 2007.

22

23

24  _____

25  LAURA MARTINEZ, CSR NO. 11332

26

27

28

LAURA MARTINEZ, CSR NO. 11332