# EXHIBIT B

# EXHIBIT B – 1

## GENERAL ORDER NO. 140



**SFGOV**
san francisco

sfgov | residents | business | government | visitors | online services | search

Superior Court >> Court Divisions >> Civil Division >> Asbestos (General Orders)

# Superior Court of California
County of San Francisco

## General Order No. 140 Re: Case Advanced Pursuant t
CALIFORNIA SUPERIOR COURT

CITY AND COUNTY OF SAN FRANCISCO

IN RE:

COMPLEX ASBESTOS LITIGATION

NO. 828684

**GENERAL ORDER NO. 140
RE: CASE ADVANCED PURSUANT TO
CODE OF CIVIL PROCEDURE SECTION
36**

_____ /

This General Order supersedes General Order No. 40 and is applicable to asbestos cases in which, subsequent to May 1, 1997, a Motion for Preference pursuant to Code of Civil Procedure section 36 is filed in San Francisco Superior Court or in which the plaintiff has indicated on the Preliminary Fact Sheet an intention to file a Motion for Preference.

In recognition of the unique and serious problems posed for this court and the litigants by the large number of asbestos bodily injury actions advanced for preferential trial dates, and the unique problems posed by those cases in which a plaintiff is dying. The policy of this court in the administration of Complex Asbestos Litigation under Standard 19 of the Standards of Judicial Administration to:

A. Promote the expeditious exchange of necessary and relevant information in order to facilitate the prompt and intelligent evaluation of liability and damage aspects wherever possible;

B. Curtail and prevent unnecessary and repetitious discovery wherever possible;

C. Encourage delegations of work responsibility and sharing of costs on common problems in an effort to avoid unnecessary duplication and expense to the litigants; and

D. Ensure completion of discovery prior to the advanced trial date.

**IT IS ORDERED:**

1. **REQUIREMENTS ATTENDANT TO PLAINTIFF'S MOTION TO ADVANCE OR MOTION FOR PREFERENCE.**

   A. Upon service by plaintiff of notice of plaintiff's deposition, plaintiff shall provide Designated Defense Counsel all nonprivileged medical, employment, economic and rehabilitation records including pathology materials and/or reports in their possession relating to plaintiff's claim;

B.  Upon filing a motion for preference pursuant to Code of Civil Procedure section 36, plaintiff shall provide Designated Defense Counsel the following:

   1.  Any additional nonprivileged medical, employment, economic and rehabilitation records and reports in their possession relating to plaintiff's claim not previously provided;

   2.  An inventory specifying, with respect to all medical or employment records, pathology and chest radiographs or CT scans within the plaintiff's possession or control and not previously provided to defendants, the following:

       a.  the facility from which each record or film was obtained;

       b.  the number of pages of records from each such location or the number of films;

       c.  the inclusive dates covered by each set of medical or employment records or the dates of each film or, alternatively, the identity of any Bates stamping on medical records; and

       d.  the date by which plaintiff will deliver to Designated Defense Counsel any such materials not already provided; and

   3.  If not previously provided, a privilege log (excluding nondiscoverable consultant writings or reports as to which an objection or claim of privilege is being raised) which describes specifically any medical or employment records withheld and the basis for each privilege claim.

C.  Pathology materials in cases subject to this order shall be provided and/or exchanged cooperatively, recognizing each side's needs to have reasonable access to the materials and not pursuant to unilateral and/or arbitrary demands precedent to release of the materials.

2.  **INTERROGATORIES DEFENDANTS' INTERROGATORIES TO PLAINTIFF.**

A.  The court has adopted and designated as exhibits to General Order No. 129 seven types of Standard Defense Interrogatories to Plaintiff (Exhibits B through H), to be answered by plaintiffs without objection except for the assertion of a claim of privilege.

B.  If not previously provided, within three days after the earlier of service by the plaintiff of the notice of the plaintiff's deposition or filing a Motion to Advance pursuant to Code of Civil Procedure section 36, plaintiff shall serve on each defendant then served in the case and upon Designated Defense Counsel answers to the appropriate set(s) of said Standard Defense Interrogatories to Plaintiff and, no later than the earlier of 30 days from the granting of the motion or 30 days before the trial, answers to the Standard Defense Interrogatories to Plaintiff, Set 2,. In the event plaintiff serves any defendant after filing the motion for preference pursuant to Code of Civil Procedure section 36, plaintiff shall simultaneously serve any such defendant with answers to the

appropriate set(s) of Standard Defense Interrogatories to Plaintiff upon local counsel, if known to plaintiff's attorney. Said answers to interrogatories may be served in the same manner as the summons and complaint.

C. Answers to Standard Defense Interrogatories to Plaintiff, within the time periods specified above, shall be served by the plaintiff without the necessity of defendant's service of said Standard Defense Interrogatories to Plaintiff upon plaintiff.

3. **INTERROGATORIES PLAINTIFF'S INTERROGATORIES TO DEFENDANTS.**

A. The court has adopted and designated as exhibits to General Order No. 129 Standard Plaintiff's Interrogatories to Defendants (Exhibits I and/or J ) which each defendant shall answer if that defendant has not previously answered. Such answers shall be provided under oath without objection except for the assertion of a claim of privilege within 20 days of the granting of the motion for preference or 75 days after service of the complaint, whichever is later. However, a defendant need not answer Interrogatory Nos. 33, 34 and 54 of Exhibit I at this time and may instead answer those interrogatories within the time frame specified in General Order No. 129.

B. The court has adopted and designated as exhibits to General Order No. 129 Plaintiffs' Standard CaseSpecific Interrogatories to Defendants and Plaintiffs' Standard CaseSpecific Interrogatories to Friction Defendants (Exhibits K and L to General Order No. 129) and a Notice of Service of Plaintiffs' Standard CaseSpecific Interrogatories to Defendants (Exhibit L1 to General Order No. 129). Plaintiffs' counsel may serve Exhibit L1 at any time after commencement of the action. Thereupon, the defendant (s) designated in the notice shall be required to answer such interrogatories within 30 days after service of the notice.

4. **REQUEST FOR IDENTIFICATION AND PRODUCTION OF DOCUMENTS AND THINGS.**

A. The court has adopted Defendants' Request for Production and Identification of Documents and Things to Plaintiff(s) (Exhibit "M" to General Order No. 129). These standard requests shall be deemed served upon plaintiff upon granting of the motion for preference, and shall be responded to under oath by plaintiff without objection except for the assertion of a claim of privilege. The responses shall be served on all defendants and Designated Defense Counsel no later than 30 days after the granting of the motion for preference or 15 days before trial, whichever is earlier. The documents required in response to the document request(s) shall be served simultaneously with said responses. Nothing in this Section shall preclude the use of subpoenas for obtaining records.

B. Any document(s) described or referenced in answers to standard interrogatories, and any index to documents shall, if not previously provided pursuant to General Order No. 129, be made available for inspection and copying upon request and at a mutually convenient time without a formal request for production of documents. Any party that answers any standard interrogatory pursuant to Code of Civil Procedure section 2030(f)(2) shall make available for inspection and copying all such documents, if not previously produced to the requesting party. If a

party makes documents available for inspection and copying pursuant to a notice under an In Re: Complex Asbestos Litigation caption with notice to all parties, that party need not produce those documents again absent a showing of good cause.

C. Any party withholding documents on the ground of any privilege shall deliver to opposing counsel and any requesting party a list of such documents. For any documents dated January 1, 1974 or later, such list may refer to specific categories of documents, provided that any indices of documents withheld shall be individually identified.

## 5. REQUEST FOR ADMISSIONS.

Any party may serve Request for Admissions on any other party no later than 30 days before the trial date. The responses to the Request for Admissions shall be mailed no later than as required by the Code of Civil Procedure or 10 days before trial, whichever is earlier.

## 6. OTHER DISCOVERY.

Any party may serve other discovery requests nonduplicative of standard discovery on any other party.

## 7. RECORD PROCUREMENT.

A. Any stipulations and/or authorizations for production of records shall be executed and provided to Designated Defense Counsel as early as possible prior to the filing of a motion for preference pursuant to Code of Civil Procedure section 36 or within seven days of receipt of the authorizations and stipulations from Designated Defense Counsel, whichever is later. (Copies of authorizations and stipulations in the form to be used are attached as Exhibits N1 through N5 to General Order No. 129.)

B. Any additional requests for authorizations and/or stipulations shall be executed and provided to Designated Defense Counsel within seven days after receipt of a written request for such authorizations and/or stipulations.

C. The duration of all authorizations shall be 180 days.

D. Upon receipt of records obtained by stipulation and/or authorization, the copy service will handdeliver copies of these records to plaintiff's counsel in the Bay Area, or overnight mail to plaintiff's counsel outside the Bay Area.

E. Except for Social Security Earnings records, the copy service will provide copies of all records to Designated Defense Counsel no sooner than seven days after delivery of the records to plaintiff's counsel unless the copy service and Designated Defense Counsel are advised in writing that plaintiff's counsel asserts an objection to such production. The copy service shall not provide copies of the records to which an objection has been asserted unless ordered to do so by this Court or unless notified by plaintiff's counsel that the objection has been withdrawn. As to Social Security Earnings records, there shall be no "firstlook". Plaintiff's counsel shall return the records provided by the copy service within seven days

after delivery. Any records retained thereafter shall be at plaintiff's cost. The copy service shall retain a copy of all records copied for a period of six years or longer upon written request of any party. Under no circumstances may the copy service charge the plaintiff more than the copy service is charging any defendant for a copy of the records.

F. Plaintiff's counsel must advise Designated Defense Counsel of any objection to production of records in writing, specifying the grounds upon which said objections are based. Any party may either make or oppose a motion to compel and/or a motion for a protective order or, without waiving objection, make a motion in limine for disclosure of records at trial.

G. All records produced pursuant to this subsection are presumed to be authenticated and to satisfy the business records exception of the hearsay rule unless the party objecting to the admission establishes the contrary by preponderance of the evidence.

H. If plaintiff alleges exposure to asbestos during the time he or she was the proprietor of a business, plaintiff's attorney shall arrange to produce any records pertaining to that business as soon as practicable and if the plaintiff has not been deposed, prior to plaintiff's deposition, at plaintiff's attorney's office or other convenient location within 75 miles of San Francisco. That request shall be in the form set forth as Exhibit M to General Order No. 129. Response to the request for business records shall be made within 10 days of the mailing of such request.

I. Nothing in this Section shall preclude the use of subpoenas for obtaining records and service of such subpoenas shall not constitute a general appearance by or on behalf of any party. If subpoenas are used, notice to all parties of such subpoenas and/or depositions must be given.

J. Except as otherwise ordered by the court, records obtained pursuant to this section shall be used only for purposes of the action in which they are so obtained unless the records are obtained in another case by subpoena or unless the plaintiff has consented to have his or her personnel records used in other cases.

## 8. WAIVER OF TIME FOR SUBPOENA OF PLAINTIFF'S PERSONAL CONSUMER RECORDS.

Absent good cause communicated in writing by plaintiff to Designated Defense Counsel upon receipt of the notice of subpoena, plaintiff shall waive the provisions of Code of Civil Procedure section 1985.3(b) with respect to that plaintiff's own records and those records will be provided subject to the provisions of section 7.E., supra.

## 9. PATHOLOGY MATERIALS AND REPORTS.

Following the granting of plaintiff's motion for preference, the parties and Designated Defense Counsel shall, upon request, provide promptly to defendants through Designated Defense Counsel or to plaintiff any subsequentlyacquired pathology materials and/or discoverable writings or reports by any pathology expert(s).

The parties and Designated Defense Counsel shall cooperate with each other to

obtain pathology materials and to exchange them so that each sides' experts have a reasonable opportunity to review the pathology materials in preparation for trial.

10. **DEPOSITION PLAINTIFF'S.**

   A. The plaintiff's deposition may be noticed only by Designated Defense Counsel or by the plaintiff. The parties shall confer, through Designated Defense Counsel, on scheduling of the plaintiff's deposition. The purpose of the conference is to set the deposition at a mutually convenient date, time and place considering the nature of the case. Nothing herein contained shall prevent the plaintiff from obtaining an ex parte order to take his or her own deposition before the defendants have appeared in the case.

   B. If the plaintiff advises defendants and Designated Defense Counsel in writing at least five days in advance of the deposition that plaintiff's counsel intends to proceed first, the plaintiff may complete his or her direct testimony before crossexamination is conducted by defendants. If this procedure is used, absent agreement of the parties or court order, the time for defendants' crossexamination shall be either 20 hours on the record or three times the amount of time used by plaintiff to complete the direct examination, whichever is longer. If, before the start of the deposition, plaintiff has not served answers to the standard defense interrogatories to plaintiff, Set 2, on each defendant then served in the case and upon Designated Defense Counsel, the duration of the deposition shall, absent agreement of the parties or court order, be the longer of 30 hours on the record or three times the amount of time used by plaintiff to complete the direct examination. The defendants will be expected to allocate the available time among themselves and, in the event of inability to agree, shall make a timely motion for protective order before expiration of the time limit.

   C. In the event any defendant is served after completion of plaintiff's deposition, such lateserved defendant(s) may request that Designated Defense Counsel schedule and notice a further deposition of the plaintiff. Said deposition shall be limited to those matters not adequately covered in the initial deposition including liability issues pertaining to the newly served defendant.

11. **PHYSICAL EXAMINATION OF PLAINTIFF.**

   A. The defendants or any of them at their option may request that plaintiff be presented to a physician of defendants' selection for a complete medical examination. The examination may at defendants' option include chest xrays, pulmonary function test, and oral history taken by the examining physician.

   B. Nothing in this provision shall limit the right of parties to apply to the court to obtain additional medical examination and/or discovery.

12. **DISCOVERY CUTOFF.**

   All discovery (with the exception of that governed by applicable sections of the General Orders or by stipulation) shall be completed prior to the assignment to a trial department.

13. **SETTLEMENT CONFERENCES.**

General Order No. 154 addresses settlement conference and related procedures.

14. **EXPERT DESIGNATION.**

General Order No. 156 shall govern expert designation, document exchange and discovery, except as provided in Section 1 of this order.

15. **MOTIONS FOR SUMMARY JUDGMENT.**

A.  In asbestos cases which have been assigned trial dates pursuant to plaintiff's motion for preference pursuant to Code of Civil Procedure section 36, the parties shall be entitled to have motions for summary judgment, including motions for Expedited Summary Judgment pursuant to General Order No. 157, heard up to and including 15 days before the date set for trial.

B.  Parties may bring such summary judgment motions pursuant to either Code of Civil Procedure Section 437c or General Order No. 157 on 15 days' notice if served in a manner which reasonably should result in receipt of the papers by the opposing party no later than 5:00 p.m. 15 days before the scheduled hearing.

C.  In cases in which expedited summary judgment motions are brought pursuant to General Order No. 157, not later than 10 days before the hearing date, unless otherwise agreed, counsel shall meet and confer and make a good faith effort to resolve whether there is a triable issue of fact that the plaintiff or plaintiff's decedent was exposed to asbestos for which the defendant is responsible.

D.  Any opposition to summary judgment motions brought pursuant to Code of Civil Procedure section 437c shall be filed with the court five court days before the hearing date and served in a manner which reasonably should result in receipt of the papers by the opposing party by 5:00 p.m. at least five court days prior to the hearing date. If the motion is brought pursuant to the expedited summary judgment procedure set forth in General Order No. 157, plaintiff shall either dismiss the defendant five court days before the hearing date or a response to such motion shall be filed with the court five court days before the hearing date and served in a manner which reasonably should result in receipt of the papers by the opposing party by 5:00 p.m. at least five court days prior to the hearing date. In the event that multiple motions are filed in the same case and are scheduled for response on the same day, the court will look favorably upon a request by the responding party for an extension of time to respond to the motion.

E.  Any reply memorandum and/or evidentiary objections to motions for summary judgment pursuant to Code of Civil Procedure section 437c or expedited motions for summary judgment pursuant to General Order No. 157 must be filed two court days before the hearing date and served in a manner which reasonably should result in receipt of the papers by the opposing party by 5:00 p.m. two court days prior to the hearing date.

F.  Absent a court order or agreement excusing the requirement to answer

standard interrogatories, or the expiration of the period within which a
motion to compel answers may be filed, failure of a defendant to have
responded to any standard interrogatory, which response would have
been relevant to the subject matter of the motion for summary
judgment, may be grounds for denial of the motion or for other relief as
authorized by Code of Civil Procedure section 437c(h).

16. **MOTIONS.**

A party filing or opposing a motion need serve complete papers only on the
plaintiff, Designated Defense Counsel and the party or parties directly affected
by the motion. As to all other parties to that case, service may be
accomplished by service of either the face page or a letter notifying the parties
of the substance of the motion. However, the serving party shall provide the
entire document(s) upon request from any party.

17. **JURISDICTION.**

Participation in the procedures established by this Order shall not constitute a
general appearance or a waiver of objection to jurisdiction. Designated
Defense Counsel's preparing, sending, filing or serving stipulations,
authorizations for records and serving subpoenas for records shall not
constitute a general appearance by or on behalf of any party.

DATED: _____

STUART R. POLLAK
Judge of the Superior Court

ALFRED G. CHIANTELLI
Judge of the Superior Court

# EXHIBIT B – 2

## GENERAL ORDER NO. 156



sfgov | residents | business | government | visitors | online services | search

Superior Court >> Court Divisions >> Civil Division >> Asbestos (General Orders)



# Superior Court of California
### County of San Francisco

## General Order No. 156 Regarding Expert Witness Dis
### CALIFORNIA SUPERIOR COURT

### CITY AND COUNTY OF SAN FRANCISCO

IN RE:

COMPLEX ASBESTOS LITIGATION

NO. 828684

**GENERAL ORDER NO. 156
REGARDING EXPERT WITNESS
DISCOVERY
AND DEPOSITIONS**

_____ /

This General Order is applicable to all asbestos litigation cases filed in the San Francisco Superior Court subsequent to January 1, 1997.

It being the policy of this court in the administration of Complex Asbestos Litigation under Standard 19 of the Standards of Judicial Administration to:

A.  Promote the expeditious exchange of necessary and relevant information in order to facilitate the prompt and intelligent evaluation of liability and damage aspects wherever possible;

B.  Curtail and prevent unnecessary and repetitious discovery wherever possible; and

C.  Encourage delegations of work responsibility and sharing of costs on common problems in an effort to avoid unnecessary duplication and expense to the litigants;

D.  Acknowledge that special problems are posed in the mass tort context including those cases in which a plaintiff is gravely ill; and

E.  Promote judicial efficiency and economy.

**IT IS ORDERED:**

1.  **MUTUAL EXPERT DEMAND DEEMED MADE**

    A.  For all pending cases in which the deadline for demanding an exchange by all parties of expert witness lists has not passed as of the effective date of this order, all parties shall be deemed to have made a demand for the exchange of expert witness lists, information concerning expert witnesses for the mutual production of discoverable reports and writings, if any, made by an expert in the course of preparing that expert's opinion. Cases in which that deadline has passed as of the effective date of this order shall be governed by the then applicable

section of the Code of Civil Procedure and/or general order of this court.

2. **MASTER EXPERT WITNESS DESIGNATION**

   A. Counsel may serve a master expert witness designation ("Master Designation"), which shall contain the information specified in Code of Civil Procedure Section 2034(f)(2)(a), (b), (d) and (e). This Master Designation should specify on its face page the date of service and each serving party (or parties). In addition, the Master Designation shall be served on all counsel on Designated Defense Counsel's current service list of plaintiff and defense counsel in this jurisdiction on the date the Master Designation is served. This Master Designation may be amended at any time by the serving party provided that party gives timely notification of any such amendments to all other parties in the litigation. If the amendment is limited to adding or deleting the names of defendants for which the Designated Defense Counsel serves a Master Designation, such notice may be provided no more frequently than bimonthly and may be served only on plaintiffs' counsel and the defendant(s) being added or deleted.

   B. Upon the service of the Master Designation, that document will supersede any previouslyserved expert designation in all cases in which an expert designation has been served.

3. **EXCHANGE OF DISCOVERABLE WRITINGS**

   A. For discoverable writings/reports of medical expert witnesses, the dates of exchange of medical expert discoverable reports or writings in their possession shall, unless otherwise agreed by the parties or ordered by the court, be:

      1. For cases governed by General Order No. 129, 90 days before the initial trial date or 20 days after the Status and Setting Conference, whichever is closer to the initial trial date in those cases; and

      2. For cases governed by General Order No. 140, no later than 10 days after the granting of the motion to advance or the motion for preference or as provided in General Order No. 140, whichever is earlier.

      3. Subsequently received medical expert discoverable writings/reports shall be promptly produced as they are received and/or become discoverable.

   B. All discoverable writings/reports addressing medical experts' opinions shall be produced by plaintiff by service on Designated Defense Counsel and by defendants or Designated Defense Counsel on plaintiff's counsel, except any such reports served within 30 days of the trial date shall be served by plaintiff directly on all defendants and on Designated Defense Counsel.

   C. For all other discoverable expert writings/reports, the initial date of exchange shall be 30 days before the initial trial date, unless otherwise agreed to by the parties or ordered by the court. Other than medical expert's writings, any discoverable expert writings/reports generated

after the abovereferenced deadlines shall be produced promptly to opposing counsel or as otherwise agreed by the parties.

D. Nothing in this General Order relieves a party of any obligation to exchange writings as set forth in Code of Civil Procedure Section 2032 (h), (i), and (j).

4. **CASESPECIFIC LISTING OF EXPERTS EXPECTED TO TESTIFY AT TRIAL.**

A. Each party shall serve a casespecific list of those experts actually contacted, retained and reasonably anticipated to testify at trial no later than 30 days before the initial trial date or, in cases granted preference under Code of Civil Procedure Section 36, 14 days before the initial trial date. This "pareddown" list can be supplemented thereafter for good cause shown.

B. No "pareddown" list need be served by any party if it would be identical to the original or Master Designation.

C. For any retained expert not on the Master Expert Witness Designation, the designating party shall serve no later than 30 days before the initial trial date a casespecific expert witness designation containing the information specified in Code of Civil Procedure Section 2034(f)(2)(ae) or, in cases granted preference under Code of Civil Procedure Section 36, 14 days before the initial trial date.

5. **SCHEDULING OF EXPERT DEPOSITIONS**

A. **Requesting and Scheduling Expert Depositions**

1. **Medical Experts**

Any party wishing to schedule the deposition of a plaintiff's medical or a defense joint medical expert witness may request a schedule of available dates and times for any or all experts who will testify on such issues at trial. Plaintiff's counsel shall request depositions of defendants' joint medical experts from Designated Defense Counsel. Any defendant seeking a deposition of a plaintiff medical expert must request Designated Defense Counsel to arrange said deposition. A schedule of available deposition dates will be provided no later than seven working days after receipt of the written request to schedule depositions, except in cases governed by General Order No. 140, in which best efforts shall be made to schedule depositions promptly.

2. **Other Experts**

Any party wishing to schedule the deposition of any other expert shall contact the party offering such witness in writing with a request for a schedule of available deposition dates. The parties offering the expert witnesses shall present such a schedule to the party requesting the deposition, unless the parties have an alternative.

3. **Time Estimates**

When scheduling plaintiff medical and defense joint medical expert witness depositions, the parties shall provide a reasonable estimate of the time anticipated for the deposition of each witness. Unless the parties otherwise agree, the time estimate shall be provided to opposing counsel (Designated Defense Counsel for defendants' joint medical expert depositions) as soon as possible and no less than 24 hours prior to the scheduled start of the deposition.

4.  Cancellation of Deposition

The parties shall cooperate in good faith to minimize late or untimely cancellations of depositions. Except as otherwise agreed or provided by General Order No.140, the parties shall provide a minimum of two working days' notification in the event of cancellation or change to a scheduled expert deposition. Where cancellation is not timely, the canceling party shall pay the expert witness his or her fee for onehalf hour of deposition time or the time estimated for the deposition, whichever is greater. This provision is intended to protect the schedules of experts and to adequately compensate them in the event of untimely cancellation.

B.  **Completion of Expert Depositions**

Unless otherwise agreed, or as described in Section C below, the parties shall complete all expert depositions prior to the initial trial date. In cases granted preference under Code of Civil Procedure Section 36, the parties shall use best efforts to complete all expert depositions before the case is assigned to a trial department. Any expert witness deposition scheduled prior to the assignment of a case to a trial department and completed prior to the swearing of the jury shall be considered timely, unless the parties have an alternative agreement with the party requesting the deposition.

C.  **Subgrouping to Prioritize Expert Depositions Option**

1.  Within five working days of the Status and Setting Conference consolidating a group of 15 cases or more, plaintiff's attorney may elect to proceed pursuant to Section C, in lieu of Section B above. Written notice of such election shall be served by plaintiff's counsel on all defendants and Designated Defense Counsel.

2.  In such cases, the parties shall confer approximately 75 days prior to the initial trial date to determine subgroups of approximately seven cases. Generally, the cases will be subgrouped by sequentially placing the lowest docket numbers into the earliest subgroups, unless other scheduling issues indicate a different subgrouping.

3.  Unless otherwise agreed, the parties shall complete all expert depositions in the first two subgroups prior to the initial trial date. Any expert witness deposition scheduled for those subgroups prior to the assignment of a case to a trial department and completed prior to the swearing of the jury shall be considered timely, unless the parties have an alternative agreement with the party requesting the deposition. Thereafter,

the parties will make a good faith effort to complete all expert witness discovery in the remaining cases from successive subgroups in time to complete the trial without delay. In the event that the cases in the first two subgroups settle in their entirety, the court may grant a short delay of the trial, if necessary, so that expert witness discovery may be completed for the next two subgroups.

4. The objective of completing discovery in the first two subgroups as set forth above does not prejudice the right of any party to request and to take depositions in a specific case or cases not in the first two subgroups.

6. **ALTERNATIVE AGREEMENTS.**

Nothing in this order shall preclude alternative agreement(s) between the party offering an expert and the party requesting the deposition. For example, those parties may agree to conduct expert depositions on a date other than provided by this order (such as 48 hours before anticipated trial testimony). Such agreements may further the objectives outlined in the preamble and should be given effect by the trial court whenever practicable, but such agreements will not restrict the authority or discretion of the trial court to control the conduct and scheduling of the trial.

DATED: _____

STUART R. POLLAK
Judge of the Superior Court

ALFRED G. CHIANTELLI
Judge of the Superior Court

# EXHIBIT C

1      IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        IN AND FOR THE COUNTY OF SAN FRANCISCO

3                ---OoO---

4   ROBERT LYMAN and SAMANTHA LYMAN,

5      Plaintiffs,

6   vs.               No. 459162

7   ASBESTOS DEFENDANTS,

8      Defendants.

9   _____/

10

11

12

13      DISCOVERY DEPOSITION OF ROBERT LYMAN

14             VOLUME VI

15          (Pages 514 to 569)

16

17

18

19      Taken before CATHLEEN M. MEUTER

20           CSR No. 12950

21          April 26, 2007

22

23

24

25

(1)        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
(2)              IN AND FOR THE COUNTY OF SAN FRANCISCO
(3)                          ---oOo---
(4)   ROBERT LYMAN and SAMANTHA
      LYMAN,
(5)
            Plaintiffs,
(6)
(7)   vs.                  No.  459162

      ASBESTOS DEFENDANTS,
(8)
            Defendants.
(9)
      _____/
(10)

(11)

(12)

(13)        DISCOVERY DEPOSITION OF ROBERT LYMAN
(14)                      VOLUME VI
(15)                 (Pages 514 to 569)

(16)

(17)

(18)

(19)        Taken before CATHLEEN M. MEUTER
(20)              CSR No. 12950
(21)              April 26, 2007
(22)

(23)

(24)

(25)

---

**[Page 516]**

(1)              DEPOSITION OF ROBERT LYMAN
(2)
(3)       BE IT REMEMBERED, that pursuant to Notice, and on
(4)   the 26th day of April 2007, commencing at the hour of
(5)   9:01 a.m., at the Lyon County Community Center, 1075
(6)   Pyramid Avenue, Silver Springs, Nevada, before me,
(7)   CATHLEEN M. MEUTER, a Certified Shorthand Reporter,
(8)   personally appeared ROBERT LYMAN, produced as a witness
(9)   in said action, and being by me previously sworn, was
(10)  thereupon examined as a witness in said cause.
(11)
(12)                      ---oOo---
(13)
(14)      PAUL VAILLANCOURT, Brayton Purcell, 222 Rush
(15)  Landing Road, Novato, California 94948, appeared on
(16)  behalf of the Plaintiffs.
(17)
(18)      ERIN MCGAHEY, Adams, Nye, Sinunu, Bruni &
(19)  Becht, 222 Kearney Street, Seventh Floor, San
(20)  Francisco, California 94111, was present telephonically
(21)  on behalf of the Defendant Weir Valves.
(22)
(23)
(24)
(25)

---

**[Page 515]**

(1)                     I N D E X
(2)                                          PAGE

(3)   EXAMINATION BY MR. TWU              521, 556
(4)   EXAMINATION BY MR. JONES            526
(5)   EXAMINATION BY MS. MROWKA           527
(6)   EXAMINATION BY MS. DAVIS            530
(7)   EXAMINATION BY MR. SELERT           532
(8)   EXAMINATION BY MR. EGLER            533, 555
(9)   EXAMINATION BY MS. OGDIE            545, 566
(10)  EXAMINATION BY MR. TUOHY            545
(11)  EXAMINATION BY MS. DAVIDSON         546
(12)  EXAMINATION BY MR. FELL             548
(13)  EXAMINATION BY MR. BENGSON          554

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

---

**[Page 517]**

(1)      AFRICA DAVIDSON, Bassi, Martini, Edlin & Blum,
(2)   351 California Street, Suite 200, San Francisco,
(3)   California 94104, was present telephonically on behalf
(4)   of the Defendant Carlisle Corporation.
(5)
(6)      STEVE EGLER, Brydon, Hugo & Parker, 135 Main
(7)   Street, 20th Floor, San Francisco, California 94105,
(8)   appeared on behalf of the Defendants Foster Wheeler;
(9)   Pneumo Abex Corporation; and Union Carbide.
(10)
(11)      MOLLY MROWKA, Dillingham & Murphy, 225 Bush
(12)  Street, Sixth Floor, San Francisco, California
(13)  94104-4207, appeared on behalf of the Defendant
(14)  Montello, Inc.
(15)
(16)      SUSAN OGDIE, Filice, Brown, Eassa & McLeod,
(17)  1999 Harrison Street, 18th Floor, Oakland, California
(18)  94612, appeared on behalf of the Defendants Chevron
(19)  Products Company; Texaco, Inc.; and Unocal Corporation.
(20)
(21)      WHITNEY J. SELERT, Georgeson Angaran, 5450
(22)  Longley Lane, Reno, Nevada 89511, appeared on behalf of
(23)  the Defendants Honeywell; and Bendix.
(24)
(25)

---

**[Page 518]**

(1)     JAMES PRICHASON, Glaspy & Glaspy, 100 Pringle
(2)  Avenue, Suite 750, Walnut Creek, California 94596, was
(3)  present telephonically on behalf of the Defendant
(4)  Garlock Seal & Technologies.
(5)
(6)     LEANETTE FLENTROY, Haight, Brown & Bonesteel,
(7)  71 Stevenson Street, 20th Floor, San Francisco,
(8)  California 94105-2981, was present telephonically on
(9)  behalf of the Defendant International Truck & Engine
(10) Corporation.
(11)
(12)    DANE JONES, Hassard, Bonnington LLP, Two
(13) Embarcadero Center, Suite 1800, San Francisco,
(14) California 94111, appeared on behalf of the Defendant
(15) John Crane, Inc.
(16)
(17)    BRENDAN J. TUOHY, Kirkpatrick & Lockhart,
(18) Preston, Gates, Ellis, LLP, 55 Second Street, Suite
(19) 1700, San Francisco, California 94105, appeared on
(20) behalf of the Defendant Crane Co.
(21)
(22)    JIM TWU, Lewis, Brisbois, Bisgaard & Smith, One
(23) Sansome Street, Suite 1400, San Francisco, California
(24) 94104, appeared on behalf of the Defendant Plant
(25) Insulation.

**[Page 519]**

(1)     BRIAN BENGSON, McNamara, Dodge, Ney, Beatty,
(2)  Slattery, Pfalzer, Borges & Brothers, LLP, 1211 Newell
(3)  Avenue, Suite 202, Walnut Creek, California 94596, was
(4)  present telephonically on behalf of the Defendant Tyco
(5)  International (US).
(6)
(7)    KIM R. DAVIS, Prindle, Decker & Amaro, 310
(8)  Golden Shore, Long Beach, California 90802, appeared on
(9)  behalf of the Defendants Drilling Speciality Company,
(10) LLC; Chevron Phillips Chemical Company, LP; A.W.
(11) Chesterton Company; and Henry Vogt Machine Company.
(12)
(13)    NEIL LUDMAN, Schiff Hardin, LLP, One Market,
(14) Spear Street Tower, 32nd Floor, San Francisco,
(15) California 94105, was present telephonically on behalf
(16) of the Defendant Owens-Illinois, Inc.
(17)
(18)    JAMES M. CONWAY, Thelen, Reid, Brown, Raysman &
(19) Steiner, LLP, 101 Second Street, Suite 1800, San
(20) Francisco, California 94105-3601, was present
(21) telephonically on behalf of the Defendants Shell Oil
(22) Company; and Mack Trucks, Inc.
(23)
(24)
(25)

**[Page 520]**

(1)     BRAD FELL, Wright, Robinson, Osthimer & Tatum,
(2)  44 Montgomery Street, 18th Floor, San Francisco,
(3)  California 94104, was present telephonically on behalf
(4)  of the Defendant Freightliner Corporation.
(5)

**[Page 521]**

(1)     ROBERT LYMAN,
(2)     previously sworn as a witness,
(3)     testified as follows:
(4) **EXAMINATION BY MR. TWU:**
(5)    Q. Let's go back on record.
(6)    Good morning, Mr. Lyman. How are you doing?
(7)    A. Okay.
(8)    Q. My understanding is you had a visit to the
(9)  hospital last night?
(10)   A. Yeah.
(11)   Q. You can't go for too long today; is that
(12) correct?
(13)   A. (Witness nods head.)
(14)   Q. Let me ask you two bookkeeping questions before
(15) I try to close this out.
(16)   Other than your lawyer did you talk to anybody
(17) about your case or your deposition since we last left
(18) you yesterday?
(19)   A. No.
(20)   Q. Look at any documents since we last left you
(21) yesterday?
(22)   A. No.
(23)   Q. We're entering the last couple phases of the
(24) deposition. Let me just go straight into it.
(25)   First off, yesterday one of the attorneys was

**[Page 526]**

**EXAMINATION BY MR. JONES:**

(1)
(2) **Q.** Mr. Lyman, how are you, sir?
(3) **A.** Good.
(4) **Q.** Dane Jones.  I represent a company called John
(5) Crane.
(6)     Do you remember ever seeing any products
(7) made by a company called John Crane during your
(8) career?
(9) **A.** No.
(10) **Q.** You, during the course of your testimony,
(11) indicated a couple of times that over your long career
(12) you'd seen some other people open up some valves and
(13) they did something with packing, but you don't know
(14) what they were doing, you didn't know who made the
(15) packing, you didn't know what packing they replaced it
(16) with, correct?
(17) **A.** That's correct.
(18) **Q.** Do you know of any papers or documents that
(19) exist that you could look at that would refresh your
(20) memory about whether any John Crane product was on any
(21) job site you ever had?
(22) **A.** No.  I wouldn't have anything like that.
(23) **Q.** Same thing true for people as well?
(24) **A.** No.
(25)     **MR. JONES:**  Thank you very much, sir.

**[Page 527]**

**EXAMINATION BY MS. MROWKA:**

(1)
(2) **Q.** Good morning, Mr. Lyman.  Can you hear me okay?
(3) **A.** Yeah, I'm okay.
(4) **Q.** Have you ever worked with or around a product
(5) called Supervisbestos?
(6) **A.** What is it?
(7) **Q.** Supervisbestos, S-u-p-e-r-v-i-s-b-e-s-t-o-s?
(8) **A.** Not that I recall.
(9) **Q.** Did you ever work with or around a product
(10) called Visbestos?
(11) **A.** I don't recall it, no.
(12) **Q.** Did you ever work with or around a product
(13) called Telvis, T-e-l-v-i-s?
(14) **A.** Not that I recall.
(15) **Q.** Did you ever work with or around a product
(16) called Imcobest, I-m-c-o-b-e-s-t?
(17) **A.** Not that I recall.
(18) **Q.** Did you ever work with or around a product
(19) called Imcosuperbest?
(20) **A.** Not that I recall, no.
(21) **Q.** Did you ever work with or around product called
(22) Shurlift, S-h-u-r-l-i-f-t?
(23) **A.** I believe I did, but I'm not -- I don't
(24) remember what it was, but I do recall seeing the name.
(25) **Q.** Do you recall where you saw the name?

**[Page 528]**

(1) **A.** On Baker's property.
(2) **Q.** Which Baker's property?
(3) **A.** In Ventura.
(4) **Q.** Was that at the yard?
(5) **A.** Yes.
(6) **Q.** Can you tell me where you saw the name?
(7) **A.** I believe it was just on some cases.
(8) **Q.** Can you describe the cases?
(9) **A.** I just vaguely remember the name.  No.
(10) **Q.** Do you know what material was in the cases?
(11) **A.** Not a clue.
(12) **Q.** Do you remember when you saw the cases?
(13) **A.** No.
(14) **Q.** Do you remember how many cases you saw?
(15) **A.** I recall there were maybe four or five.
(16) **Q.** Do you recall the size of the cases?
(17) **A.** I really don't.
(18) **Q.** Did you see anything being done with the cases?
(19) **A.** No.  They were just being stored there.
(20) **Q.** Did you personally handle my material that was
(21) in the cases?
(22) **A.** No.
(23) **Q.** Were you around anybody that personally handled
(24) any material that was in the cases?
(25) **A.** Not that I know of.

**[Page 529]**

(1) **Q.** Other than seeing possibly the cases at the
(2) Baker yard, that would be it; is that correct?
(3) **A.** Yes.
(4) **Q.** Did you ever work with or around a product
(5) called Univis, U-n-i-v-i-s?
(6) **A.** No.
(7) **Q.** Did you ever work with or around a product
(8) called Oilbestos, O-i-l-b-e-s-t-o-s?
(9) **A.** Not that I recall.
(10) **Q.** Have you ever worked or around any product that
(11) was distributed by a company called Montello, Inc.?
(12) **A.** Yeah, Montello.  Again, I don't remember what
(13) it was.  But I've seen the logo, and I believe it was
(14) in the oil fields.
(15) **Q.** Can you tell me what kind of container you saw
(16) the logo on?
(17) **A.** No.  Again, this is 40 years ago.
(18) **Q.** Can you recall when you saw the logo?
(19) **A.** No.
(20) **Q.** Can you tell me what material was in any
(21) container that had that logo on it?
(22) **A.** No.  I don't recall.
(23) **Q.** Did you ever personally handle any material
(24) that was in the container that you saw with that label
(25) on it?

**[Page 530]**

1)   A. Not that I know of.

2)   Q. Did you ever work around anybody that handled

3)  any material with that label on it?

4)   A. I don't recall.

5)   Q. Do you recall where or which oil field you were

6)  in?

7)   A. I believe it was on Sespe.

8)   Q. I think I asked you this.

9)      But do you recall the type of material that was

10)  in the container that had the label on it?

11)   A. No.

12)   Q. Can you recall what type of container had that

13)  label on it?

14)   A. I just recall the name.  I really don't

15)  remember the — I don't really remember the container

16)  that well.

17)   Q. Okay.  Other than just remembering the name,

18)  you don't have any other specific recollection —

19)   A. No.

20)   Q. — about Montello?

21)   A. No.

22)   MS. MROWKA:  Thank you.

23)   MR. TWU:  Next.

24)   EXAMINATION BY MS. DAVIS:

25)   Q. Good morning, Mr. Lyman.

**[Page 531]**

1)   A. Hi.

2)   Q. Sir, have you ever heard of a company called

3)  A.W. Chesterton?

4)   A. Yes.

5)   Q. What do you associate with the name A.W.

6)  Chesterton?

7)   A. Nothing.  I just remember the company.

8)   Q. So is it fair to say you don't associate any

9)  products or services with the name A.W. Chesterton?

10)   A. I don't recall, no.

11)   Q. Do you know if you ever worked with or around

12)  an A.W. Chesterton product?

13)   A. I know I have, but I don't remember what it

14)  was.

15)   Q. Then what is your basis for believing that you

16)  worked with or around an A.W. Chesterton product?

17)   A. Because I recall the name.

18)   Q. Do you associate a product or service with the

19)  name A.W. Chesterton?

20)   A. I believe it was a service.

21)   Q. Do you recall what type of service A.W.

22)  Chesterton provided?

23)   A. No.

24)   Q. Do you recall where you would have seen A.W.

25)  Chesterton provide a service?

**[Page 532]**

1)   A. Again, probably on Sespe, but I'm not sure.

2)   Q. Do you recall who you were employed with?

3)   A. It was Baker.

4)   Q. Other than a service, do you associate anything

5)  else with the name A.W. Chesterton Company?

6)   A. No.

7)   Q. Have you ever heard of Diaseal M?

8)   A. No.

9)   Q. Do you know if you ever worked with or around a

10)  Diaseal M product?

11)   A. No.

12)   Q. That's spelled D-i-a-s-e-a-l, capital M.

13)   A. No.

14)   Q. Have you ever heard of Flosal?

15)   A. No.

16)   Q. Do you know if you ever worked with or around a

17)  Flosal product?

18)   A. No.

19)   Q. And that's spelled F-l-o-s-a-l.

20)   A. No.

21)   MS. DAVIS:  Thank you, sir.

22)   EXAMINATION BY MR. SELERT:

23)   Q. Mr. Lyman, my name is Whitney Selert, and I

24)  represent Honeywell International.

25)   A. Hi.

**[Page 533]**

1)   Q. Have you ever heard of the name Bendix?

2)   A. Yeah.

3)   Q. When you think of the name Bendix, what do you

4)  associate that name with?

5)   A. Actually, it was automotive.  I can't recall

6)  what it was.

7)   Q. I'm sorry.  It was on a what?

8)   A. Automotive.

9)   Q. Do you recall during the period when you were

10)  working seeing Bendix products or automotive products

11)  where you worked?

12)   A. No.

13)   Q. Do you remember when you might have, if ever,

14)  been around a Bendix product?

15)   A. Back in the '70s.  That's it.

16)   Q. Other than that recollection, do you have any

17)  other recollection of being around a product —

18)   A. No.

19)   Q. — with the brand name Bendix?

20)   A. (Witness shakes head.)

21)   MR. SELERT:  Okay.  That's all the questions I

22)  have.

23)   EXAMINATION BY MR. EGLER:

24)   Q. Good morning, sir.

25)   A. Hi.

# EXHIBIT D

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        IN AND FOR THE COUNTY OF SAN FRANCISCO

3            ---OoO---

4   ROBERT LYMAN and SAMANTHA
    LYMAN,
5
        Plaintiffs,
6
    vs.                    No.  459162
7
    ASBESTOS DEFENDANTS,
8
        Defendants.
9
    _____/
10

11

12

13        DEPOSITION OF ROBERT LYMAN

14            VOLUME V

15        (Pages 435 to 513)

16

17            .

18

19    Taken before CATHLEEN M. MEUTER

20        CSR No. 12950

21        April 25, 2007

22                    .

23

24                    .

25

[Page 437]

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

—OOO—

ROBERT LYMAN and SAMANTHA
LYMAN,

    Plaintiffs,

vs.    No. 459162

ASBESTOS DEFENDANTS,

    Defendants.

_____/

DEPOSITION OF ROBERT LYMAN
VOLUME V
(Pages 435 to 513)

Taken before CATHLEEN M. MEUTER
CSR No. 12950
April 25, 2007

---

DEPOSITION OF ROBERT LYMAN

BE IT REMEMBERED, that pursuant to Notice, and on the 25th day of April 2007, commencing at the hour of 9:05 a.m., at the Lyon County Community Center, 1075 Pyramid Street, Silver Springs, Nevada, before me, CATHLEEN M. MEUTER, a Certified Shorthand Reporter, personally appeared ROBERT LYMAN, produced as a witness in said action, and being by me previously sworn, was thereupon examined as a witness in said cause.

—oOo—

PAUL VAILLANCOURT, Brayton Purcell, 222 Rush Landing Road, Novato, California 94948, appeared on behalf of the Plaintiffs.

ERIN MCGAHEY, Adams, Nye, Sinunu, Bruni & Becht, 222 Kearney Street, Seventh Floor, San Francisco, California 94111, was present telephonically on behalf of the Defendant Weir Valves.

[Page 436]

I N D E X

|  | PAGE |
|---|---|
| EXAMINATION BY MR. TWU | 441, 476 |
| EXAMINATION BY MS. OGDIE | 441, 484 |
| EXAMINATION BY MR. EGLER | 450 |
| EXAMINATION BY MR. CONWAY | 453, 457 |
|  | 496, 507 |
| EXAMINATION BY MS. DAVIDSON | 454 |
| EXAMINATION BY MR. TUOHY | 456, 506 |
| EXAMINATION BY MR. WIEBMANN | 458, 502 |
| EXAMINATION BY MS. DAVIS | 460, 502 |
| EXAMINATION BY MS. MROWKA | 482 |

[Page 438]

AFRICA DAVIDSON, Bassi, Martini & Blum, 351 California Street, Suite 200, San Francisco, California 94104, was present telephonically on behalf of the Defendant Carlisle Corporation.

STEVE EGLER, Brydon, Hugo & Parker, 135 Main Street, 20th Floor, San Francisco, California 94105, appeared on behalf of the Defendants Foster Wheeler; Pneumo Abex Corporation; and Union Carbide.

MOLLY MROWKA, Dillingham & Murphy, 225 Bush Street, Sixth Floor, San Francisco, California 94104-4207, appeared on behalf of the Defendant Montello, Inc.

SUSAN OGDIE, Filice, Brown, Eassa & McLeod, 1999 Harrison Street, 18th Floor, Oakland, California 94612, appeared on behalf of the Defendants Chevron Products Company; Texaco, Inc.; and Unocal Corporation.

WHITNEY J. SELERT, Georgeson Angaran, 5450 Longley Lane, Reno, Nevada 89511, appeared on behalf of the Defendants Honeywell; and Bendix.

[Page 439]

1)        JAMES PRICHASON, Glaspy & Glaspy, 100 Pringle
2)   Avenue, Suite 750, Walnut Creek, California 94596, was
3)   present telephonically on behalf of the Defendant
4)   Garlock Seal & Technologies.
5)
6)        DANE JONES, Hassard, Bonnington LLP, Two
7)   Embarcadero Center, Suite 1800, San Francisco,
8)   California 94111, appeared on behalf of the Defendant
9)   John Crane, Inc.
10)
11)       BRENDAN J. TUOHY, Kirkpatrick & Lockhart,
12)  Preston, Gates, Ellis, LLP, 55 Second Street, Suite
13)  1700, San Francisco, California 94105, appeared on
14)  behalf of the Defendant Crane Co.
15)
16)       JIM TWU, Lewis, Brisbois, Bisgaard & Smith, One
17)  Sansome Street, Suite 1400, San Francisco, California
18)  94104, appeared on behalf of the Defendant Plant
19)  Insulation.
20)
21)       BRIAN BENGSON, McNamara, Dodge, Ney, Beatty,
22)  Slattery, Pfalzer, Borges & Brothers, LLP, 1211 Newell
23)  Avenue, Suite 202, Walnut Creek, California 94596, was
24)  present telephonically on behalf of the Defendant Tyco
25)  International (US).

[Page 440]

1)        KIM R. DAVIS, Prindle, Decker & Amaro, 310
2)   Golden Shore, Long Beach, California 90802, appeared on
3)   behalf of the Defendants Drilling Speciality Company,
4)   LLC; Chevron Phillips Chemical Company, LP; A.W.
5)   Chesterton Company; and Henry Vogt Machine Company.
6)
7)        YAKOV WIEBMANN, Schiff Hardin, LLP, One Market,
8)   Spear Street Tower, 32nd Floor, San Francisco,
9)   California 94105, was present telephonically on behalf
10)  of the Defendant Owens-Illinois, Inc.
11)
12)       JAMES M. CONWAY, Thelen, Reid, Brown, Raysman &
13)  Steiner, LLP, 101 Second Street, Suite 1800, San
14)  Francisco, California 94105-3601, appeared on behalf of
15)  the Defendants Shell Oil Company; and Mack Trucks, Inc.
16)
17)       JILL RIZZO, Wright, Robinson, Osthimer & Tatum,
18)  888 South Figueroa Street, Suite 1800, Los Angeles,
19)  California 90017, was present telephonically on behalf
20)  of the Defendant Freightliner Corporation.
21)
22)
23)
24)
25)

[Page 441]

1)        ROBERT LYMAN,
2)        previously sworn as a witness,
3)        testified as follows:
4)   EXAMINATION BY MR. TWU:
5)        Q. Back on record.
6)        Good morning, Mr. Lyman. How are you doing
7)   today?
8)        A. I'm good.
9)        Q. Let me just ask you a couple bookkeeping (sic)
10)  questions before we resume with our questioning.
11)       Since we last left yesterday, other than
12)  your lawyer, have you talked to anybody about your
13)  deposition or your case?
14)       A. No.
15)       Q. Since we last left yesterday, have you looked
16)  at any documents to refresh your memory?
17)       A. I meant to, but I forgot.
18)       Q. All right. When we left yesterday, we're still
19)  talking about your employment at Cudd Pressure
20)  Controls. I believe there are still other attorneys
21)  that have some questions regarding that employment.
22)       Who is first?
23)  EXAMINATION BY MS. OGDIE:
24)       Q. I have a couple of additional questions for you
25)  Mr. Lyman on Cudd Pressure Control. Again, if you

[Page 442]

1)   can't hear me, let me know.
2)        A. I hear you fine.
3)        Q. All right. Very good.
4)        These oil well heads that you were working on
5)   for Cudd Pressure, they were wall out in open plains
6)   and fields in the foothills of California; is that
7)   correct?
8)        A. Most of them, yes.
9)        Q. Basically we're talking about dirt ground,
10)  scrub on the ground, grass on the ground kinds of
11)  conditions at these oil fields?
12)       A. No grass; dirt.
13)       Q. Lots of dirt. Some oil?
14)       A. Lots of oil.
15)       Q. Lots of oil spilled on the ground.
16)       In terms of doing any cleanup work for Cudd
17)  Pressure Controls if you spilled something or broke a
18)  tool or a material that you had brought to the site,
19)  did you personally clean that up?
20)       A. I've drilled wells and had the spray 50 feet in
21)  the air covering all over me.
22)       Q. If you spilled stuff on the ground was, because
23)  it was dirt, you didn't bother to clean it up?
24)       A. I didn't clean it.
25)       Q. Did you ever see anybody else coming around

[Page 459]

1) with -- removing insulation while working at Cudd,
2) right?
3)     A. Yes.
4)     Q. All that insulation was -- removing insulation
5) from pipes, was that insulation all fiberglass
6) insulation?
7)     MR. VAILLANCOURT: Lacks foundation.
8)     MS. OGDIE: Asked and answered.
9) BY MR. WIEBMANN:
10)     Q. Mr. Lyman, can you describe what you saw people
11) removing when you were at Cudd?
12)     MR. CONWAY: Objection. Asked and answered.
13) BY MR. WIEBMANN:
14)     Q. Mr. Lyman, you also mentioned that -- and I
15) apologize in I go over something that's been asked
16) already. I just want to make sure.
17)     You also mentioned that you had to remove
18) insulation from pipes yourself; is that true?
19)     MR. CONWAY: Asked and answered.
20)     THE WITNESS: I didn't have to, but I did.
21) BY MR. WIEBMANN:
22)     Q. You mentioned that you removed it in order to
23) be able to have access to the valves that hooked onto
24) the Christmas trees?
25)     MR. VAILLANCOURT: Asked and answered.

[Page 460]

1) Harassing.
2)     MS. DAVIS: Misstates testimony.
3)     (Multiple counsel join.)
4)     MS. OGDIE: Counsel that was all covered
5) yesterday.
6)     MS. DAVIS: There's no insulation on a
7) Christmas tree.
8)     MR. WIEBMANN: Right. But on the pipes leading
9) up to the Christmas trees, I just don't believe that
10) there was a description of that insulation yesterday.
11)     MR. JONES: There was.
12)     MR. VAILLANCOURT: There was.
13)     MS. OGDIE: Asked and answered.
14)     MR. WIEBMANN: Withdrawn.
15)     MR. VAILLANCOURT: Thank you.
16)     MR. TWU: I'm going to call a break now.
17)     (Break taken 9:28 a.m. to 9:37 a.m.)
18) EXAMINATION BY MS. DAVIS:
19)     Q. Back on the record.
20)     Good morning, Mr. Lyman. My name is Kim Davis.
21) I'm going to ask you probably the majority of the
22) questions for the rest of the day. But I want to ask
23) you about Cudd -- your work at Cudd.
24)     You delivered nitrogen and diesel number two
25) only for Cudd; is that correct?

[Page 461]

1)     A. No. I've used other products, but I don't
2) remember the names.
3)     Q. Were all of these products used to get the oil
4) to come up out of the ground?
5)     A. Increase flow.
6)     Q. When you would arrive to a well site for Cudd,
7) a Christmas tree would be present, right?
8)     A. Yeah.
9)     Q. The well had already been drilled; is that
10) correct?
11)     A. Yeah.
12)     Q. This is for Cudd?
13)     A. (Witness nods head.)
14)     Q. You said that you saw drilling mud delivered
15) one time while working for Cudd, correct?
16)     A. I said at least one time I saw it.
17)     Q. Was that the Barroid?
18)     A. I believe the truck was marked Barroid.
19)     Q. Was this -- did you see the drilling mud pull
20) up to a nearby well, or was it the well that you were
21) actually working on?
22)     A. A well right next to me.
23)     Q. Okay. You were usually pumping nitrogen and
24) diesel number two in a well that had already been
25) drilled; is that correct?

[Page 462]

1)     A. Yeah.
2)     Q. How near was the well that you saw drilling mud
3) delivered to on this at least one occasion for Cudd?
4)     A. Probably 20 feet.
5)     Q. I would like to ask you about your employment
6) with Baker Hughes.
7)     Did you work for Baker Hughes right after you
8) stopped employment with Cudd Pressure Control?
9)     A. Yeah. I believe I was working for Cudd when I
10) left for Baker. And they weren't Baker Hughes then.
11) They were just Baker.
12)     Q. What year do you believe you began working for
13) Baker? It would have been sometime after 1985,
14) correct, because that's when you worked for Cudd?
15)     A. I think it was '89 or '90. These dates are
16) killing me.
17)     Q. According to the research that I performed,
18) Baker Hughes became a company as a result of a merger
19) in 1987.
20)     Does that help refresh your recollection?
21)     A. That's probably something we didn't know about
22) at that time.
23)     Q. Okay. Do you recall what company appeared on
24) your pay stub?
25)     A. Baker Oil.

**[Page 463]**

1) Q. But you believe you worked for Baker Oil
2) sometime in 1989 or 1990?
3) A. Yeah.
4) Q. What year did you break your neck while working
5) for Baker Hughes if you recall?
6) A. I don't know. I think it was '88 or somewhere
7) around there.
8) Q. So you were at least working for Baker in 1988;
9) is that correct?
10) A. I believe that's the year, but, again, I'm not
11) sure.
12) Q. Do you recall how long you had been working at
13) Baker before you broke your neck?
14) A. About seven years, six years.
15) Q. How long did you work for Baker Oil Company?
16) A. When I broke my neck, that was pretty much it.
17) It took two years recovery. And the doctor told me I
18) couldn't work the oil fields anymore.
19) Q. After you broke your neck, you never returned
20) to the oil fields to work; is that correct?
21) A. That's correct.
22) Q. How long did you actually work for Baker Oil
23) total?
24) A. I think it was nine years, but I'm not sure.
25) I'm not a clock watcher or a year watcher.

**[Page 464]**

1) Q. Well, you had previously said that you believe
2) you began working for Baker right after Cudd, and you
3) worked for Cudd in about 1985 and 1986; is that
4) correct?
5) A. Yeah, somewhere around there.
6) Q. Most likely you would have started working at
7) Baker Hughes sometime after 1986; is that correct?
8) A. Yes.
9) Q. Do you recall what year you stopped working at
10) Baker Hughes? I know dates are hard for you. I'm just
11) trying to narrow this down.
12) A. I think it was '89 I broke my neck. But I
13) worked a month with a broken neck before I went to a
14) hospital. And that's when they told me I had a broken
15) neck.
16) Q. Okay. What was your job title at Baker Oil?
17) A. A chemical technician and a driver.
18) Q. Did you belong to a union?
19) A. At Baker, I was a teamster.
20) Q. Where was Baker Oil located?
21) A. On Ventura Avenue, 2000-something.
22) Q. What city was that?
23) A. Ventura.
24) Q. Did Baker Oil have locations all over the
25) United States?

**[Page 465]**

1) A. All over the western United States, from Texas
2) west.
3) Q. Baker Oil was a very large exploration and
4) drilling company, correct?
5) A. Yes.
6) Q. They had their own drilling fluids and drilling
7) additives, correct?
8) A. Correct.
9) Q. Have you ever heard of Performax?
10) A. I don't recall it.
11) Q. Baker Hughes also made their own tools like
12) fishing tools and drilling heads, that kind of thing?
13) A. Like I said, when I worked for Baker, Hughes
14) was not a part of it.
15) Q. Okay. Well, Baker, they made their own tools,
16) correct?
17) A. No, not that I know of.
18) Q. What kind of a truck did you drive for Baker?
19) A. It was a ten-speed diesel, and it had a
20) 500-gallon tank and two 200-gallon tanks, then an open
21) space with wooden sides that I could load up to 50
22) 55-gallon drums.
23) Q. Do you recall the manufacturer of this truck?
24) A. I think it was an International. I'm not sure
25) though.

**[Page 466]**

1) Q. Did you ever drive any other trucks for Baker?
2) A. Not that I recall, no.
3) Q. So you were assigned to this one truck the
4) entire time you worked for Baker; is that correct?
5) A. Yeah. I serviced the wells.
6) Q. Did you ever drive an oiler truck for Baker?
7) A. What do you mean an oiler truck?
8) Q. Like a hot oiler truck? When an oil well would
9) get plugged, they would send an oiler truck out to get
10) the -- they called it BS. It's kind of a wax that
11) would build up in the lines.
12) Have you ever heard of that?
13) A. Yeah. I've never heard the expression oiler
14) truck.
15) Q. Okay. So you were never present when anyone
16) came out to unplug the lines, correct?
17) A. That's what I did.
18) Q. Well, okay --
19) A. Nitrogen and --
20) Q. That was to get the oil to come out, correct?
21) A. And unplug the lines.
22) Q. Okay. Would you fill up the tanks and obtain
23) the 55-gallon drums from the Ventura site, the Baker
24) Ventura site?
25) A. Yes.

**[Page 467]**

1)    **Q.** Did the truck have a tool box or supply box?

2)    **A.** I got tools that I carried with me.

3)    **Q.** Did you ever carry any other materials with

4)  you?

5)    **A.** Like what?

6)    **Q.** Anything used to make repairs in the field.

7)    **A.** Like I said, I had my own tools.

8)    **Q.** Did you ever stock the tools or materials that

9)  were in your truck?

10)    **A.** I didn't need a whole lot.  Usually anything in

11)  the oil field a hammer, screwdriver, wrench, that's it.

12)  Basically a hammer, just beat it to death.

13)    **Q.** Okay.  I believe you said a sledgehammer was

14)  what was usually used to repair things in the oil

15)  field; is that correct?

16)    **A.** That's the tool of choice.

17)    **Q.** Okay.  For Baker, how many land-based oil wells

18)  did you visit per day?

19)    **A.** Maybe 20.

20)    **Q.** How long would it take you to hook up your

21)  tanker truck or drop off your chemicals at each of

22)  these oil wells on average?

23)    **A.** On average, about 20 minutes.

24)    **Q.** Was there any reason that you would spend more

25)  than 20 minutes at any particular well?

**[Page 468]**

1)    **A.** Yeah, depending on how low the company let it

2)  get before calling us.

3)    **Q.** What is the longest amount of time that you

4)  would spend at a well?

5)    **A.** I've spent a couple of days.

6)    **Q.** But this was rare, correct?

7)    **A.** Yeah, very rare.

8)    **Q.** Did you deliver nitrogen and diesel number two

9)  when you were employed with Baker?

10)    **A.** No.

11)    **Q.** When you went out to the field would Baker

12)  Hughes be the drilling company that was out there

13)  drilling the well -- or Baker Oil?  I'm sorry.

14)    **A.** Generally, no.

15)    **Q.** No?  Okay.

16)    **A.** We have drilled wells, but as a rule, no.

17)    **Q.** Do you know the names of any of the contractors

18)  that were drilling wells when you would go out to a

19)  site?

20)    **A.** Not that I recall.

21)    **Q.** You would deliver corrosion inhibitors; is that

22)  correct?

23)    **A.** Yeah.

24)    **Q.** Were there any other types of chemicals that

25)  you delivered?

**[Page 469]**

1)    **A.** Yeah, there were.  Like I said at the

2)  beginning, I had over 50 different types of chemicals

3)  that I, for the life of me, can't remember the names.

4)    **Q.** Just real quick to go back to Cudd.

5)    Did you ever pump CO2 down into a hole to get

6)  the crude oil to come up?

7)    **A.** No.

8)    **Q.** I think that's a west Texas thing.

9)    Have you ever heard of Milchem or New Park

10)  drilling fluids?  Milchem is spelled M-i-l-c-h-e-m; and

11)  New Park is N-e-w P-a-r-k.

12)    **A.** New Park, yes.

13)    **Q.** Have you ever heard of Baker Hughes Drilling

14)  Fluids also known as BHDF?

15)    **A.** Yeah, after they merged with Baker.  I was out

16)  of the business then.  I was recuperating.

17)    **Q.** Okay.  Do you know if Baker had their own

18)  drilling fluids?

19)    **A.** Not before the merger they didn't.

20)    **Q.** Do you believe that Hughes had their own

21)  drilling fluids before the merger?

22)    **A.** Yeah, they did.

23)    **Q.** Did all of the drilling fluids that you saw

24)  delivered to any of the wells that you were assigned to

25)  come in either a drilling tanker truck or a 55-gallon

**[Page 470]**

1)  drums?

2)    **A.** In a tanker truck usually.

3)    **Q.** The drilling muds were pumped into the mud

4)  tank, is that correct, or they were hooked up from

5)  the -- strike that.

6)    They were hooked up --

7)    **A.** From the truck.

8)    **Q.** To the tank?

9)    **A.** And some of it they'd mix in the field and did

10)  whatever they did with it.

11)    **Q.** Okay.  How did that mud come packaged that was

12)  mixed in the field?

13)    **MS. MROWKA:** Objection.  Lacks foundation.

14)  Calls for speculation.

15)    **THE WITNESS:** I just know they mixed it.  They

16)  had dry ingredients and mixed it with some sort of

17)  liquid.

18)  **BY MS. DAVIS:**

19)    **Q.** Was this mixed in the mud tank?

20)    **A.** No.  They mixed it in a truck, the rotating

21)  mixers.

22)    **Q.** Okay.

23)    **A.** They'd put it all in there and mix it.

24)    **Q.** Were you actually present when any of the

25)  materials were mixed in this mixing truck?

[Page 471]

1)    A. I was near it.
2)    Q. How close were you?
3)    A. Maybe 40, 50 feet.
4)    Q. Okay. Do you know how any of the dry materials
5) came packaged?
6)    A. Usually in bags; 50-pound bags, I guess, 55.
7)    Q. Do you know the brand name, manufacturer, or
8) supplier of any of those dry materials that came in
9) 55-pound bags?
10)    A. No. I was too far away to really see that.
11)    Q. Do you recall seeing any colors, markings, or
12) logos on those bags?
13)    A. Yeah. But I don't remember what they were.
14)    Q. Now the mud tank was about 40 feet long and
15) about 8 feet wide; is that correct?
16)    A. The truck?
17)    Q. I'm talking about the mud tank.
18)    A. It wasn't 40 feet long.
19)       MS. MROWKA: Assumes facts.
20) BY MS. DAVIS:
21)    Q. Can you tell me the dimensions of the mud tank?
22)    A. Not really. But I know it wasn't 40 feet. It
23) was probably 20 feet, not even that.
24)    Q. Were there — well, strike that.
25)       Did you hook up your lines for these corrosion

[Page 472]

1) chemicals to the mud tank?
2)    A. Directly into the head of the well.
3)    Q. Okay. So you would have hooked your lines up
4) to the Christmas tree only; is that correct?
5)    A. Or I'd go down the pipe. If the tree wasn't on
6) there, I'd go directly into the pipe.
7)    Q. Have you ever heard of OCT valves?
8)    A. Yeah. I've heard of them, but I didn't take
9) them apart.
10)    Q. Right. Have you ever heard of Cameron valves?
11)    A. No.
12)    Q. Most of the valves on the Christmas trees had O
13) rings or a U cup seals made of rubber or neoprene; is
14) that correct?
15)    A. The ones I saw, yeah.
16)    Q. Have you ever heard of Aquaness (phonetic)?
17)    A. I don't recall it, no.
18)    Q. Have you ever heard of Chemlink (phonetic)?
19)    A. Yes.
20)    Q. Have you ever heard of Petrolite (phonetic)?
21)    A. Yes.
22)    Q. Do you believe that you ever delivered any of
23) these chemicals to oil wells for Baker Oil?
24)    A. I can't really recall.
25)    Q. Did you ever deliver any hydrochloric acid?

[Page 473]

1)    A. Yes.
2)    Q. Did you ever deliver any barites? That's
3) b-a-r-i-t-e-s?
4)    A. I don't believe so.
5)    Q. Did you ever deliver bitonites,
6) b-i-t-o-n-i-t-e-s?
7)    A. No.
8)    Q. Did you ever deliver any attapulgite,
9) a-t-t-a-p-u-l-g-i-t-e?
10)    A. No.
11)    Q. I'm just -- you said you delivered 50 or so
12) chemicals. So I'm going through some of the chemicals
13) that were actually --
14)    A. I just don't know the name.
15)    Q. I'm asking you if any of these names ring a
16) bell as to the chemicals you delivered.
17)    A. They probably had another commercial name.
18)    Q. Did you ever deliver any sodium tetraphosphate?
19)    A. Not under that name, no.
20)    Q. Did you ever deliver any mica, m-i-c-a?
21)    A. I've delivered product with mica in it.
22)    Q. Did you ever deliver any potassium chloride?
23)    A. That's a deadly poison. I don't believe so.
24)    Q. Did you ever deliver any filming amine,
25) a-m-i-n-e?

[Page 474]

1)    A. I don't recall.
2)    Q. Did you ever deliver any sodium sulfate?
3)    A. Yes.
4)    Q. Did you ever deliver any Cronox, C-r-o-n-o-x?
5) This was a Baker brand name.
6)    A. No.
7)    Q. Have you ever heard of any drilling muds
8) referred to as KD40 or KD700?
9)    A. Yes.
10)    Q. In regards to the Christmas tree, have you ever
11) heard -- or do you recall any of the Christmas trees
12) that you hooked up to being manufactured by Cameron?
13)    A. I've seen parts manufactured by Cameron, but I
14) don't recall a Christmas tree.
15)    Q. How about Dril-Quip, D-r-i-l, dash, Q-u-i-p?
16)    A. No.
17)    Q. FMC?
18)    A. S what?
19)    Q. As a Christmas tree.
20)       (Reporter speaks.)
21) BY MR. DAVIS:
22)    A. F as in Frank, M as in Mary, and C as in cat.
23)    A. FMC, not that I recall.
24)    Q. How about National Oil Well?
25)    A. National, yes.

# EXHIBIT E

1 | **DILLINGHAM & MURPHY, LLP**
MOLLY J. MROWKA, ESQ. (SBN 190133)
2 | RODRIGO E. SALAS, ESQ. (SBN 194462)
225 Bush Street, 6th Floor
3 | San Francisco, California 94104-4207
Telephone:    (415) 397-2700
4 | Facsimile:    (415) 397-3300

5 | Attorneys for Defendant
MONTELLO, INC.

6

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | IN AND FOR THE COUNTY OF SAN FRANCISCO

10 | ROBERT F. LYMAN and | Case No.: CGC-06-459162
SAMANTHA LYMAN |
11 | | **DEFENDANT MONTELLO, INC.'S**
Plaintiffs, | **SPECIAL INTERROGATORIES TO**
12 | | **PLAINTIFF, SET ONE**
vs. |
13 | | Date Action Filed:  December 29, 2006
ASBESTOS DEFENDANTS (B♦P) |
14 | As Reflected on Exhibits B, B-1, C, H, I; and
DOES 1-8500; |
15 | |
Defendants |
16 | |
17 |

18 | PROPOUNDING PARTY:   Defendant MONTELLO, INC.

19 | RESPONDING PARTY:   Plaintiff ROBERT F. LYMAN

20 | SET NUMBER:   ONE

21 | **SPECIAL INTERROGATORIES**

22 | **SPECIAL INTERROGATORY NO.1:**

23 |    Do YOU contend that YOU were **EXPOSED** to an asbestos product manufactured by

24 | MONTELLO, INC.? (For purposes of these interrogatories, **YOU** and **YOUR** includes

25 | Plaintiff **ROBERT F. LYMAN**, Plaintiff's employees, representatives, attorneys, agents, and

26 | investigators, and anyone else acting on his behalf; **EXPOSED** means and includes working

27 | with, or in close proximity to others who were performing work with the product.)

28 | ///

Page 1 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET
ONE



1  **SPECIAL INTERROGATORY NO. 2:**

2      Identify each asbestos product manufactured by MONTELLO, INC. which YOU

3  contend YOU were EXPOSED.

4  **SPECIAL INTERROGATORY NO. 3:**

5      If YOU contend that YOU were EXPOSED to an asbestos product manufactured by

6  MONTELLO, INC., state all facts which support YOUR contention.

7  **SPECIAL INTERROGATORY NO. 4:**

8      If YOU contend YOU were EXPOSED to an asbestos product manufactured by

9  MONTELLO, INC., IDENTIFY ALL DOCUMENTS which support YOUR contention.

10  (As used in these interrogatories, "IDENTIFY ALL DOCUMENTS" shall mean and include

11  the title, date and author of the document and the name, address, telephone number, both

12  residential and business, of the present custodian of said document; "DOCUMENT" means a

13  writing, as defined in Evidence Code section 250, and includes the original, or a copy of

14  handwriting, typewriting, printing, photostats, photographs, electronically stored information,

15  and every other means of recording upon any tangible thing and form of communicating or

16  representation, including letters, words, pictures, sounds, or symbols, or combinations of them.)

17  **SPECIAL INTERROGATORY NO. 5:**

18      If YOU contend YOU were EXPOSED to an asbestos product manufactured by

19  MONTELLO, INC., IDENTIFY ALL PERSONS who have knowledge of any fact or facts

20  which support YOUR contention. (As used in these interrogatories, the term "IDENTIFY,"

21  when used as reference to a natural person, means to set forth his, her or its (a) full name,

22  together with any and all known aliases or nicknames; (b) present residence address or, if

23  known, the last known residence address; and the date which such person is last or believed to

24  have resided at that address; (c) residence phone number, or if unknown, the last known

25  residence phone number; (d) present employer, employment position or title and business

26  address or, if unknown, the last known information in each of these respects and the date when

27  such person is last known or believed to have had that employer, position or title and business

28  address; and (e) business telephone number or, if unknown, his or her last known business

1  telephone number and the date when that person is last known or believed to have had this

2  business telephone number.)

3  <u>SPECIAL INTERROGATORY NO. 6:</u>

4       If YOU contend that YOU were **EXPOSED** to an asbestos product manufactured by

5  **MONTELLO, INC.**, for each and every product identify by name and **ADDRESS** each

6  location where YOU allege YOU were **EXPOSED.**

7  <u>SPECIAL INTERROGATORY NO. 7:</u>

8       State with specificity the manner in which YOU were allegedly **EXPOSED** to each

9  asbestos product manufactured by **MONTELLO, INC.** at each of the locations at which YOU

10  claim such exposure occurred.

11  <u>SPECIAL INTERROGATORY NO. 8:</u>

12       For each location where YOU allege YOU were **EXPOSED** to an asbestos product

13  manufactured by **MONTELLO, INC.**, state YOUR proximity to each product during YOUR

14  alleged injurious exposure.

15  <u>SPECIAL INTERROGATORY NO. 9:</u>

16       Do YOU contend that YOU were **EXPOSED** to an asbestos product supplied by

17  **MONTELLO, INC.?**

18  <u>SPECIAL INTERROGATORY NO. 10:</u>

19       Identify each asbestos product which YOU contend was supplied by **MONTELLO,**

20  **INC.**, which YOU contend YOU were **EXPOSED.**

21  <u>SPECIAL INTERROGATORY NO. 11:</u>

22       If YOU contend that YOU were **EXPOSED** to an asbestos product supplied by

23  **MONTELLO, INC.**, state all facts which support YOUR contention.

24  <u>SPECIAL INTERROGATORY NO. 12:</u>

25       If YOU contend YOU were **EXPOSED** to an asbestos product supplied by

26  **MONTELLO, INC.**, **IDENTIFY ALL PERSONS** who have knowledge of any fact or facts

27  which support YOUR contention.

28  <u>SPECIAL INTERROGATORY NO. 13:</u>



1    If YOU contend that YOU were EXPOSED to an asbestos product supplied by

2    MONTELLO, INC., for each and every product identify by name and ADDRESS each

3    location where YOU allege YOU were EXPOSED.

4    <u>SPECIAL INTERROGATORY NO. 14:</u>

5    State with specificity the manner in which YOU were allegedly EXPOSED to each

6    asbestos product supplied by MONTELLO, INC. at each of the locations at which YOU claim

7    such exposure occurred.

8    <u>SPECIAL INTERROGATORY NO. 15:</u>

9    For each location where YOU allege YOU were EXPOSED to an asbestos product

10   supplied by MONTELLO, INC., state YOUR proximity to each product during YOUR

11   alleged injurious exposure.

12   <u>SPECIAL INTERROGATORY NO. 16:</u>

13   Identify the duration of each exposure to each asbestos product YOU contend was

14   supplied by MONTELLO, INC. at each of the locations at which YOU claim such exposure

15   occurred.

16   <u>SPECIAL INTERROGATORY NO. 17:</u>

17   For each location where YOU allege YOU were EXPOSED to a product which

18   contained asbestos supplied by MONTELLO, INC., identify the date(s) on which such

19   exposure took place.

20   <u>SPECIAL INTERROGATORY NO. 18:</u>

21   If YOU contend YOU were EXPOSED to an asbestos product supplied by

22   MONTELLO, INC., IDENTIFY ALL DOCUMENTS which support YOUR contention.

23   <u>SPECIAL INTERROGATORY NO. 19:</u>

24   Do YOU contend that YOU were EXPOSED to an asbestos product distributed by

25   MONTELLO, INC.?

26   <u>SPECIAL INTERROGATORY NO. 20:</u>

27   Identify each asbestos product which YOU contend was distributed by MONTELLO,

28   INC., which YOU contend YOU were EXPOSED.

1  **SPECIAL INTERROGATORY NO. 21:**

2       If YOU contend that YOU were EXPOSED to an asbestos product distributed by

3  MONTELLO, INC., state all facts which support YOUR contention.

4  **SPECIAL INTERROGATORY NO. 22:**

5       If YOU contend YOU were EXPOSED to an asbestos product distributed by

6  MONTELLO, INC., IDENTIFY ALL PERSONS who have knowledge of any fact or facts

7  which support YOUR contention.

8  **SPECIAL INTERROGATORY NO. 23:**

9       If YOU contend that YOU were EXPOSED to an asbestos product distributed by

10 MONTELLO, INC., for each and every product identify by name and ADDRESS each

11 location where YOU allege YOU were EXPOSED.

12 **SPECIAL INTERROGATORY NO. 24:**

13      State with specificity the manner in which YOU were allegedly EXPOSED to each

14 asbestos product distributed by MONTELLO, INC. at each of the locations at which YOU

15 claim such exposure occurred.

16 **SPECIAL INTERROGATORY NO. 25:**

17      For each location where YOU allege YOU were EXPOSED to an asbestos product

18 distributed by MONTELLO, INC., state YOUR proximity to each product during YOUR

19 alleged injurious exposure.

20 **SPECIAL INTERROGATORY NO. 26:**

21      Identify the duration of each exposure to each asbestos product YOU contend was

22 distributed by MONTELLO, INC. at each of the locations at which YOU claim such exposure

23 occurred.

24 **SPECIAL INTERROGATORY NO. 27:**

25      For each location where YOU allege YOU were EXPOSED to an asbestos product

26 distributed by MONTELLO, INC., identify the date(s) on which such exposure took place.

27 **SPECIAL INTERROGATORY NO. 28:**

28

Page 5 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET
ONE

1    If YOU contend YOU were EXPOSED to an asbestos product distributed by

2    MONTELLO, INC., IDENTIFY ALL DOCUMENTS which support YOUR contention.

3    SPECIAL INTERROGATORY NO. 29:

4    Do YOU contend that YOU were EXPOSED to drilling fluid additives sold by

5    MONTELLO, INC.?

6    SPECIAL INTERROGATORY NO. 30:

7    If YOU contend that YOU were EXPOSED to drilling fluid additives sold by

8    MONTELLO, INC., IDENTIFY each such drilling fluid additive.

9    SPECIAL INTERROGATORY NO. 31:

10    If YOU contend that YOU were EXPOSED to drilling fluid additives sold by

11    MONTELLO, INC., for each product state all facts which support YOUR contention.

12    SPECIAL INTERROGATORY NO. 32:

13    If YOU contend that YOU were EXPOSED to drilling fluid additives sold by

14    MONTELLO, INC., for each product IDENTIFY ALL PERSONS who have knowledge of

15    any fact or facts which support YOUR contention.

16    SPECIAL INTERROGATORY NO. 33:

17    If YOU contend that YOU were EXPOSED to drilling fluid additives sold by

18    MONTELLO, INC., for each product identify by name and ADDRESS each location where

19    YOU allege YOU were EXPOSED.

20    SPECIAL INTERROGATORY NO. 34:

21    If YOU contend that YOU were EXPOSED to drilling fluid additives sold by

22    MONTELLO, INC., for each product IDENTIFY ALL DOCUMENTS which support

23    YOUR contention.

24    SPECIAL INTERROGATORY NO. 35:

25    For each location where YOU contend YOU were EXPOSED to drilling fluid additives

26    sold by MONTELLO, INC., state YOUR proximity to each product during YOUR alleged

27    injurious exposure.

28

1    **SPECIAL INTERROGATORY NO. 36:**

2          State with specificity the manner in which **YOU** were allegedly **EXPOSED** to each

3    drilling fluid additive sold by **MONTELLO, INC.** at each of the locations at which **YOU**

4    claim such exposure occurred.

5    **SPECIAL INTERROGATORY NO. 37:**

6          For each location where **YOU** contend **YOU** were **EXPOSED** to drilling fluid additives

7    sold by **MONTELLO, INC.**, please identify how the drilling fluid additives were used.

8    **SPECIAL INTERROGATORY NO. 38:**

9          For each location where **YOU** contend that **YOU** were **EXPOSED** to drilling fluid

10   additives sold by **MONTELLO, INC.** identify the date(s) on which such exposure took place.

11   **SPECIAL INTERROGATORY NO. 39:**

12         For each location where **YOU** contend **YOU** were **EXPOSED** to drilling fluid additives

13   sold by **MONTELLO, INC.**, identify by name and **ADDRESS**, each supplier from whom each

14   of the drilling fluid additives sold by **MONTELLO, INC.** was obtained.

15   **SPECIAL INTERROGATORY NO. 40:**

16         Do **YOU** contend that **YOU** were **EXPOSED** to drilling mud additives sold by

17   **MONTELLO, INC.**?

18   **SPECIAL INTERROGATORY NO. 41:**

19         If **YOU** contend that **YOU** were **EXPOSED** to drilling mud additives sold by

20   **MONTELLO, INC.**, **IDENTIFY** each such drilling mud additive.

21   **SPECIAL INTERROGATORY NO. 42:**

22         If **YOU** contend that **YOU** were **EXPOSED** to drilling mud additives sold by

23   **MONTELLO, INC.**, for each product **IDENTIFY ALL PERSONS** who had knowledge of

24   any fact or facts which support **YOUR** contention.

25   **SPECIAL INTERROGATORY NO. 43:**

26         If **YOU** contend that **YOU** were **EXPOSED** to drilling mud additives sold by

27   **MONTELLO, INC.**, for each product **IDENTIFY ALL DOCUMENTS** which support

28   **YOUR** contention.

 

**SPECIAL INTERROGATORY NO. 44:**

If YOU contend that YOU were EXPOSED to drilling mud additives sold by MONTELLO, INC., identify by name and ADDRESS each location where YOU allege YOU were EXPOSED.

**SPECIAL INTERROGATORY NO. 45:**

State with specificity the manner in which YOU were allegedly EXPOSED to each drilling mud additive sold by MONTELLO, INC. at each of the locations at which YOU claim such exposure occurred.

**SPECIAL INTERROGATORY NO. 46:**

For each location where YOU contend YOU were EXPOSED to drilling mud additives sold by MONTELLO, INC., state YOUR proximity to each product during YOUR alleged injurious exposure.

**SPECIAL INTERROGATORY NO. 47:**

For each location where YOU contend YOU were EXPOSED to drilling mud additives sold by MONTELLO, INC., identify how the drilling mud additives were used.

**SPECIAL INTERROGATORY NO. 48:**

For each location where YOU contend that YOU were EXPOSED to drilling mud additives sold by MONTELLO, INC. identify the date(s) on which such exposure took place.

**SPECIAL INTERROGATORY NO. 49:**

If YOU have ever been deposed in any civil action, including but not limited to, workers' compensation matters, for each such deposition, please state the date of the deposition, the names of the court reporters, the court and action number of the involved matter, and whether YOU were deposed as a witness or party.

**SPECIAL INTERROGATORY NO. 50:**

IDENTIFY the "TRANSCRIPT" (as used in these interrogatories, the term TRANSCRIPT refers to any transcription of a deposition, trial, hearing or other proceeding) of each PERSON with knowledge any fact or facts which support YOUR contention that YOU

 

1 | were **EXPOSED** to asbestos products sold, distributed, supplied, or manufactured by

2 | **MONTELLO, INC.** from 1966 to the present.

3 | **SPECIAL INTERROGATORY NO. 51:**

4 |      **IDENTIFY** the **DECLARATION** (as used in these interrogatories, the term

5 | **DECLARATION** refers to any affidavit and/or written or printed declaration or statement of

6 | facts, confirmed by the oath or affirmation of the party making it) of each **PERSON** with

7 | knowledge of the facts which support **YOUR** contention that **YOU** were **EXPOSED** to

8 | asbestos products sold, distributed, supplied or manufactured by **MONTELLO, INC.** from

9 | 1966 to the present.

10 | **SPECIAL INTERROGATORY NO. 52:**

11 |      State all facts which support **YOUR** cause of action for false representation against

12 | **MONTELLO, INC.**, as asserted in **YOUR** complaint for damages, in San Francisco Superior

13 | Court civil action no. CGC-06-459162.

14 | **SPECIAL INTERROGATORY NO. 53:**

15 |      **IDENTIFY ALL DOCUMENTS** which support **YOUR** cause of action for false

16 | representation against **MONTELLO, INC.**, as asserted in **YOUR** complaint for damages, in

17 | San Francisco Superior Court civil action no. CGC-06-459162.

18 | **SPECIAL INTERROGATORY NO. 54**

19 |      **IDENTIFY ALL PERSONS** which knowledge of any fact or facts which support

20 | **YOUR** cause of action for false representation against **MONTELLO, INC.**, as asserted in

21 | **YOUR** complaint for damages, in San Francisco Superior Court civil action no. CGC-06-

22 | 459162.

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///



1    <u>**SPECIAL INTERROGATORY NO. 55**</u>

2    **IDENTIFY** the each and every fact known by each person **YOU** contend has

3    knowledge of any fact or facts which support **YOUR** cause of action for false representation

4    against **MONTELLO, INC.**, as asserted in **YOUR** complaint for damages, in San Francisco

5    Superior Court civil action no. CGC-06-459162.

6    Dated:  April 30, 2007                    DILLINGHAM & MURPHY, LLP

7

8                                        By:

9                                            MOLLY J. MROWKA, ESQ.
                                             Attorney for Defendant
                                             MONTELLO, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION IN SUPPORT OF ADDITIONAL DISCOVERY.

I, MOLLY J. MROWKA, declare:

1.    I am an attorney duly licensed to practice law before the courts of California, and am an attorney with the law firm of Dillingham & Murphy, LLP, attorneys of record for Defendant MONTELLO, INC. If called upon to do so, I could and would competently testify to the matters of fact set forth within this declaration, as I have personal knowledge thereof.

2.    MONTELLO, INC. is propounding to Plaintiff Robert Lyman the attached set of special interrogatories.

3.    This set of interrogatories will cause the total number of specially prepared interrogatories propounded to Plaintiff to exceed the number of specifically prepared interrogatories permitted by § 2030.030 of the Code of Civil Procedure.

4.    This set of interrogatories contains a total of fifty five (55) specially prepared interrogatories.

5.    I am familiar with the issues in this matter. I have previously propounded no specially prepared interrogatories to plaintiff Robert Lyman.

6.    I have personally examined each of the questions in this set of interrogatories.

7.    This number of questions is warranted under § 2030.040 of the Code of Civil Procedure because these specially prepared interrogatories are the most expedient way to obtain the information sought. Further, none of the questions in this set of interrogatories is being propounded for any improper purpose, such as to harass the party, or the attorney for the party, to whom it is directed, or to cause unnecessary delay or needless increase in the cost of litigation.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct, and that this declaration was executed in San Francisco, California on April 30, 2007.

Molly J. Mrowka

Page 11 - Case No.: CGC-06-459162
DEFENDANT MONTELLO, INC.'S REQUEST FOR SPECIAL INTERROGATORIES TO PLAINTIFF, SET ONE

 

### PROOF OF SERVICE

Lyman v. Asbestos Defendants, San Francisco Superior Court CGC-06-459162

I am a citizen of the United States, and employed in the City and County of San Francisco. I am over the age of eighteen (18) years, and not a party to the within above-entitled action. My business address is 225 Bush Street, 6th Floor, San Francisco, California 94104-4207. On April 30, 2007, I served the following on each party listed below:

### DEFENDANT MONTELLO, INC.'S SPECIAL INTERROGATORIES TO PLAINTIFF, SET ONE

☐     **(BY FAX)** By sending a true copy thereof by facsimile machine to the numbers listed below, and then depositing for collection and mailing, following ordinary business practices, a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid.

X     **(BY PERSONAL SERVICE)** By causing a true copy thereof enclosed in a sealed envelope to be personally delivered on the date indicated below.

Brayton Purcell
222 Rush Landing Rd
Novato, CA 94945
(415) 898-1555

☐     **(BY OVERNIGHT DELIVERY)** By causing a true copy thereof, enclosed in a sealed envelope, to be delivered via overnight courier service.

X     **(BY MAIL)** By depositing for collection and mailing, following ordinary business practices, a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid.

### LETTER NOTICE OF THE ABOVE DOCUMENT WAS SERVED BY MAIL ON ALL DEFENDANTS LISTED IN THE ATTACHED SERVICE LIST.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 30, 2007, at San Francisco, California.

_____
Mardoux Graff

Proof Of Service